## MASSACHUSETTS *v.* UNITED STATES

No. 76–1500.   Argued December 6, 1977—Decided March 29, 1978

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, and STEVENS, JJ., joined, and in Parts I, II–C, and III of which STEWART and POWELL, JJ., joined. STEWART and POWELL, JJ., filed an opinion concurring in part and concurring in the judgment, *post*, p. 470. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 471. BLACKMUN, J., took no part in the decision or consideration of the case.

*Terence P. O'Malley*, Assistant Attorney General of Massachusetts, argued the cause for petitioner. With him on the brief were *Francis X. Bellotti*, Attorney General, and *S. Stephen Rosenfeld* and *Margot Botsford*, Assistant Attorneys General.

*Allan A. Ryan, Jr.*, argued the cause for the United States. On the brief were *Solicitor General McCree, Assistant Attorney General Ferguson, Stuart A. Smith*, and *Ann Belanger Durney*.[*]

---

[*] *W. Bernard Richland* and *Samuel J. Warms* filed a brief for the city of New York as *amicus curiae* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.*

As part of a comprehensive program to recoup the costs of federal aviation programs from those who use the national airsystem, Congress in 1970 imposed an annual registration tax on all civil aircraft that fly in the navigable airspace of the United States. 26 U. S. C. § 4491.[1] The constitutional question presented in this case is whether this tax, as applied to an aircraft owned by a State and used by it exclusively for police functions, violates the implied immunity of a state government from federal taxation. We hold that it does not.

I

Since the passage of the Air Commerce Act of 1926, 44 Stat. 568, the Federal Government has expended significant amounts of federal funds to develop and strengthen an integrated national airsystem and to make civil air transportation safe and practical. It has established, developed, and improved a wide array of air navigational facilities and services that benefit all aircraft flying in the Nation's navigable

---

*MR. JUSTICE STEWART and MR. JUSTICE POWELL join only Parts I, II–C, and III of this opinion. MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join the entire opinion.

[1] In pertinent part, § 4491 provides:

"(a) Imposition of Tax.

"A tax is hereby imposed on the use of any taxable civil aircraft during any year at the rate of—

"(1) $25, plus

"(2) (A) in the case of an aircraft (other than a turbine-engine-powered aircraft) 2 cents a pound for each pound of the maximum certificated takeoff weight in excess of 2,500 pounds, or (B) in the case of any turbine engine powered aircraft, 3½ cents a pound for each pound of the maximum certificated takeoff weight."

Title 26 U. S. C. § 4492 (c) (2) defines "use" as flying an aircraft "in the navigable airspace of the United States." "[T]axable civil aircraft" includes aircraft owned and operated by a State. § 4492 (a); see n. 6, infra.

airspace,[2] and it has also made substantial grants to state and local governments to assist in planning and developing airports.

In 1970, after an extended study of the national airsystem, Congress concluded that the level of annual federal outlays on aviation, while significant, had not been sufficient to permit the national airsystem to develop the capacity to cope satisfactorily with the current and projected growth in air transportation. To remedy this situation, Congress enacted two laws, the Airport and Airway Development Act of 1970 (Development Act), 84 Stat. 219, and the Airport and Airway Revenue Act of 1970 (Revenue Act), 84 Stat. 236, which together constitute a comprehensive program substantially to expand and improve the national airport and airway system over the decade beginning July 1, 1970. In the Development Act, Congress provided for vastly increased federal expenditures both for airport planning and development and for the further expansion of federal navigational services. More importantly for present purposes, the Revenue Act adopted several measures to ensure that federal outlays that benefited the civil users of the airways would, to a substantial extent, be financed by taxing measures imposed on those civil users.[3]

---

[2] These include: assisting and controlling aircraft operations during take-offs and landings at our Nation's larger airports; air traffic control to Instrument Flight Rule (IFR) users and navigation assistance to all categories of aircraft after takeoff operations are concluded and prior to landing; and miscellaneous services for both Visual Flight Rule (VFR) and IFR users, such as filing flight plans, weather information, and rescue operations. See Department of Transportation, Airport and Airway Cost Allocation Study, Part 1, Report: Determination, Allocation, and Recovery of System Costs 21 (1973) (hereinafter DOT Study). These services are provided, principally by the Federal Aviation Administration, pursuant to 49 U. S. C. § 1348.

[3] Believing that the public at large benefits from the existence and operation of the military, Congress decided that the costs imposed on the national airsystem by the military should be paid for from general revenues. See H. R. Rep. No. 91-601, pp. 3-4, 38 (1969); cf. S. Rep. No. 91-699, pp. 4-5, 7 (1970).

The Revenue Act, therefore, enacted for the first time, or increased, several taxes on civil aviation. Congress conceived of each of these revenue measures as user fees and calculated that they would produce revenues that would defray a significant and increasing percentage of the civil share of the annual total federal airport and airway expenditures for the fiscal years 1970 to 1979.[4] To assure that the revenues from these user taxes would be expended only for the expansion, improvement, and maintenance of the air transportation system, an Airport and Airway Trust Fund was created, and Congress provided that the amount of revenue generated by the aviation user charges would, during the 1970's, be paid into this trust fund, as would any money appropriated from general revenues for aviation purposes.[5] Revenue Act, § 208, 84 Stat. 250, 49 U. S. C. § 1742; see H. R. Rep. No. 91–601, p. 41 (1969) (hereinafter H. R. Rep.); S. Rep. No. 91–706, pp. 23–25 (1970) (hereinafter S. Rep.).

The financing measures in the Revenue Act are intended to promote two purposes. First, they are designed to serve the congressional policy of having those who especially benefit from Government activity help bear the cost. See H. R. Rep.

---

[4] Congress projected that the total aviation expenditures would increase from $1,029 million in fiscal 1970 to $1,727 million in fiscal 1979 and that total revenues from the user taxes would increase from $446.5 million in fiscal 1970 to $1,399.9 million in fiscal 1979. The additional required appropriations or the total deficit would thus decrease from $582.5 million in fiscal 1970 to $327.1 million in fiscal 1979. Because the military share of the total expenditures—which is paid from general revenues, see n. 3, *supra*—will increase from $178 million in fiscal 1970 to $291 million in fiscal 1979, civil aviation would pay an increasing share of the federal expenditures allocable to it. The "civil share deficit" would decrease from $404.5 million in fiscal 1970 to $36.1 million in fiscal 1979. H. R. Rep. No 91–601, p. 38 (1969); see S. Rep. No. 91–699, pp. 4–5, 7 (1970).

[5] The authority to use trust fund monies for the operating expenses of the air navigational facilities, temporarily suspended in 1971, see Pub. L. 92–172, 85 Stat. 491, has since been restored. See 90 Stat. 873–874.

38; S. Rep. 5. Second, the financing provisions are intended to ensure that the capacity of the national air system would not again be found to be insufficient to meet the demands of increasing use. Congress believed that the inadequacy in past levels of investment in aviation had been due to the substantial competition from nonaviation budgetary requests. See H. R. Rep. 3. The trust fund and the user fees were, therefore, established to provide funding for aviation that would "generally match and grow with the demand" for use of the airways. *Id.*, at 8.

The tax challenged in this case is one of several adopted in the Revenue Act, the annual aircraft registration tax. Revenue Act, § 206, 26 U. S. C. § 4491. It imposes an annual "flat fee" tax on all civil aircraft—including those owned by State and National Governments [6]—that fly in the navigable

---

[6] The terms of the statutory provision make clear that Congress intended it to apply to state-owned aircraft. By the statutory terms, the levy is to be imposed on "taxable civil aircraft," which is defined by 26 U. S. C. § 4492 (a) (1) to include any engine-driven aircraft "registered, or required to be registered under section 501 (a) of the Federal Aviation Act of 1958 [72 Stat. 771] (49 U. S. C. § 1401 (a))." Since § 501 (a) of the Federal Aviation Act provides that the only aircraft that may be lawfully operated without having been registered are aircraft of the national defense forces of the United States, there is no question under the statute but that state-owned aircraft are subject to the registration tax.

The legislative history supports this view. In connection with the discussion of one of the other taxes enacted by the Revenue Act, the Committee Reports explained that it was terminating the statutory exemption that previously had operated to benefit the States "since this tax is now generally viewed as a user charge[, so] there would appear to be no reason why these governmental [bodies] should not pay for their share of the use of the airway facilities." H. R. Rep. 46; see S. Rep. 17–18. Obviously, this reasoning is equally applicable to all measures the Congress conceived of as user fees. Moreover, the Committee Reports' discussion of § 4491 explicitly stated that the tax was "based upon the premise that *all* aircraft should pay a basic fee as an entry fee to use the system," H. R. Rep. 40 (emphasis supplied); see S. Rep. 20–21, and further that the tax applied to civil aircraft owned by the United States. See H. R.

airspace of the United States.[7]  The amount of the annual charge depends upon the type and weight of the aircraft: those with piston-driven engines pay $25 plus 2 cents per pound of the maximum certificated takeoff weight in excess of 2,500 pounds whereas turbine-powered aircraft pay $25 plus 3½ cents per pound of the maximum certificated takeoff weight. See n. 1, *supra*.

As is apparent from both the rate of tax in § 4491 and the legislative history of the Revenue Act, Congress did not contemplate that the annual registration tax would generate significant amounts of revenue, but rather that the bulk of the funds generated by the system would come from other user taxes,[8] each of which is related more directly to the level

Rep. 49; S. Rep. 20. Since the statute by its terms includes state-owned aircraft and since the legislative history broadly indicates that all government-owned civil aircraft are covered, petitioner has conceded that the statute applies. See Brief for Petitioner 8–9, n. 1; Tr. of Oral Arg. 6–7.

[7] The navigable airspace of the United States is administratively delineated pursuant to 49 U. S. C. § 1301 (24).

[8] The following table from the legislative history illustrates the congressional understanding that the annual registration fee would recover only a small percentage of the costs imposed on the airsystem by civil aviation:

"TABLE 3.—REVENUES FROM AVIATION USER TAXES,
SELECTED FISCAL YEARS, 1965–79
[In millions of dollars]

| User tax | Actual | | | Estimated | | | |
|---|---|---|---|---|---|---|---|
| | 1965 | 1967 | 1969 | 1970 | 1971 | 1974 | 1979 |
| Passenger ticket tax | $147.5 | $194.5 | $259.5 | $373.7 | $507.2 | $679.2 | $1,083.2 |
| Cargo tax, 5 percent | | | | 18.7 | 42.7 | 63.1 | 134.2 |
| Fuel tax | 16.7 | 14.4 | 11.0 | 26.5 | 45.8 | 54.3 | 76.7 |
| International departure tax, $3 | | | | 12.4 | 27.1 | 36.5 | 58.7 |
| Taxes on tires and tubes used on aircraft | 2.0 | 2.4 | 2.6 | 2.8 | 3.0 | 3.5 | 5.0 |
| Aircraft registration taxes | | | | 12.4 | 26.6 | 32.3 | 42.1 |
| Total | 166.2 | 211.3 | 273.1 | 446.5 | 652.4 | 868.9 | 1,399.9 |

"Source: U. S. Treasury Department and Federal Aviation Administra-

of use of the navigable airspace. Thus, commercial aviation's share of the cost of the federal activities would be raised primarily through an 8% tax on the price of domestic air passenger tickets, see Revenue Act, § 203, 26 U. S. C. § 4261; a $3 "head tax" on international flights originating in the United States, *ibid.;* and a 5% tax on the cost of transporting property by air, Revenue Act, § 204, 26 U. S. C. § 4271. Noncommercial general aviation—the generic category that includes state police aircraft—would pay most of its share through a 7-cent-per-gallon tax on aircraft fuel. See Revenue Act, § 202, 26 U. S. C. § 4041.

But while the registration tax was expected to produce only modest revenues and was understood to be only indirectly related to system use, Congress regarded it as an integral and essential part of the network of user charges.[9] Moreover, it is

tion, Office of Aviation Economics." H. R. Rep. 39 (footnotes omitted); see S. Rep. 10.

Indeed, this table overstates the estimated revenues from the registration tax since it assumes that the rate of tax on piston aircraft will be $25 plus 2 cents per pound, rather than the $25 plus 2 cents for each pound in excess of 2,500 pounds that is provided for in § 4491. *Ibid.* As the table indicates, aircraft are subject to an aircraft tire and tube tax, which is imposed by 26 U. S. C. § 4071, but this is a highly insignificant revenue-generating measure.

[9] The reasons the registration tax was added to the Revenue Act are clearly stated in the Committee Reports:

"The [Committee] determine[s] that, to some extent, the costs of the airport and airway system are incurred because many aircraft may use the system at some time, even though most of the time most of these craft are not in the air. In addition, it appears that heavier and faster aircraft are generally responsible for much of the increased need of sophisticated control facilities and approach and landing facilities." H. R. Rep. 48; see S. Rep. 8–9.

Thus, the registration tax was included in the bill in an attempt to recover part of the marginal cost imposed on the national airsystem by the addition of a possible user and to ensure that the fee system reflects in some manner the additional costs that heavier and faster (*i. e.*, turbine-powered) aircraft impose upon it.

the only tax imposed on those general noncommercial aircraft owned and operated by States. Although Congress was generally of the view that the States should be required to pay aviation user charges since "there would appear to be no reason why [they] should not pay for their fair share of the use of the airway facilities," H. R. Rep. 46; see S. Rep. 17–18, and in fact made the States subject to all the other user charges, it retained a statutory exemption for the States from the aircraft fuel, tire, and tube taxes. See 68A Stat. 480, as amended, 26 U. S. C. § 4041 (g) (1976 ed.); 26 U. S. C. § 4221.

The Commonwealth of Massachusetts owns several aircraft that are subject to the tax imposed by § 4491, including a helicopter which the Commonwealth uses exclusively for patrolling highways and other police functions.[10] In 1973 the United States notified the Commonwealth that it had been assessed for a tax of $131.43 on this state police helicopter for the period from July 1, 1970, to June 30, 1971. The Commonwealth refused to pay and the United States thereafter levied on one of the Commonwealth's bank accounts and collected this tax, plus interest and penalties.

Pursuant to 28 U. S. C. § 1346 (1970 ed. and Supp. V), the Commonwealth then instituted this action for a refund of the money collected, contending that the United States may not constitutionally impose a tax that directly affects the essential and traditional state function of operating a police force. The District Court dismissed the complaint in an unreported decision. It first indicated its view that the most recent decisions of this Court had so limited a State's constitutional immunity from federal taxation that a constitutional challenge could not succeed unless the tax was discriminatory or the State showed that the tax actually impaired a State function. Because the Commonwealth had not alleged that this nondiscrimi-

---

[10] At oral argument, the Commonwealth informed us that it owns three aircraft in addition to the helicopter that is the subject of this case. See Tr. of Oral Arg. 4.

natory annual fee had in fact impaired the operations of its police force, the District Court concluded dismissal was mandatory. In the alternative, the District Court held that the tax in question is a user fee and that, whatever the present scope of the constitutional principle of implied immunity of a state government from federal taxes, a user fee does not implicate the doctrine. The Court of Appeals for the First Circuit affirmed, solely on the latter ground. 548 F. 2d 33 (1977). We granted certiorari, 432 U. S. 905 (1977), to resolve a conflict between this decision and *Georgia Dept. of Transp.* v. *United States,* 430 F. Supp. 823 (ND Ga. 1976), appeal docketed, No. 77–16. See also *City of New York* v. *United States,* 394 F. Supp. 641 (SDNY 1975), affirmance order, 538 F. 2d 308 (CA2 1976); *Texas* v. *United States,* 72–2 USTC ¶ 16.048 (WD Tex. 1972), aff'd, 73–1 USTC ¶ 16,085 (CA5 1973) (holding that 8% air passenger tax may constitutionally be applied to state employees traveling on official state business). We affirm.

## II

A review of the development of the constitutional doctrine of state immunity from federal taxation is a necessary preface to decision of this case. For while the Commonwealth concedes that certain types of user fees may constitutionally be applied to its essential activities,[11] it urges that the decisions of this Court teach that the validity of any impost levied against a State must be judged by a "bright-line" test: If the measure is labeled a tax and/or imposed or collected pursuant to the Internal Revenue Code, it is unconstitutional as applied to an essential state function even if the revenue measure

---

[11] At oral argument, it conceded that a State could not, even when performing traditional governmental activities, insist on the right to have the Postal Service carry unstamped letters or—if there were such roads—to use federally constructed toll roads without paying the required toll. See *id.,* at 8. Its argument before this Court is that there is a difference of constitutional magnitude between such charges and the tax imposed by § 4491.

operates as a user fee. See Brief for Petitioner 14–28. And the Commonwealth maintains that § 4491 is invalid for the additional reason that the values furthered by this constitutional doctrine necessarily require the invalidation of a levy such as that under § 4491 which, as an annual fee, is not directly related to use. See Brief for Petitioner 28–41. Neither contention has merit. The principles that have animated the development of the doctrine of state tax immunity and the decisions of this Court in analogous contexts persuade us that a State enjoys no constitutional immunity from a nondiscriminatory revenue measure, like § 4491, which operates only to ensure that each member of a class of special beneficiaries of a federal program pay a reasonable approximation of its fair share of the cost of the program to the National Government.[12] Like the Court of Appeals, we have no occasion to decide either the present vitality of the doctrine of state tax immunity or the conditions under which it might be invoked.

## A

That the existence of the States implies some restriction on the national taxing power was first decided in *Collector* v. *Day*, 11 Wall. 113 (1871). There this Court held that the immunity that federal instrumentalities and employees then enjoyed from state taxation, see *Dobbins* v. *Commissioners*, 16 Pet. 435 (1842); *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), was to some extent reciprocal and that the salaries paid state judges were immune from a nondiscriminatory federal tax. This immunity of State and Federal Governments

---

[12] The Commonwealth's arguments and the questions presented in its brief to this Court, see Brief for Petitioner 3–4, establish that our Brother REHNQUIST's dissent errs in suggesting that the discussion establishing this proposition is superfluous. See *post*, at 472. Moreover, the dissent's assertion to the contrary notwithstanding, the United States' brief in this Court recognizes that a decision validating § 4491 requires rejection of the Commonwealth's submission concerning the scope of the doctrine of state tax immunity. See Brief for United States 22–23, n. 19.

from taxation by each other was expanded in decisions over the last third of the 19th century and the first third of this century, see, *e. g., Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218 (1928); *Indian Motorcycle Co.* v. *United States,* 283 U. S. 570 (1931) (sales from a private person to one sovereign may not be taxed by the other), but more recent decisions of this Court have confined the scope of the doctrine.

The immunity of the Federal Government from state taxation is bottomed on the Supremacy Clause, but the States' immunity from federal taxes was judicially implied from the States' role in the constitutional scheme. *Collector* v. *Day, supra,* emphasized that the States had been in existence as independent sovereigns when the Constitution was adopted, and that the Constitution presupposes and guarantees the continued existence of the States as governmental bodies performing traditional sovereign functions. 11 Wall., at 125–126. To implement this aspect of the constitutional plan, *Collector* v. *Day* concluded that it was imperative absolutely to prohibit any federal taxation that directly affected a traditional state function, quoting Mr. Chief Justice Marshall's aphorisms that " 'the power of taxing . . . may be exercised so far as to destroy,' " *id.,* at 123, quoting *McCulloch* v. *Maryland, supra,* at 427, and " 'a right [to tax], in its nature, acknowledges no limits.' " 11 Wall., at 123, quoting *Weston* v. *Charleston,* 2 Pet. 449, 466 (1829). The Court has more recently remarked that these maxims refer primarily to two attributes of the taxing power. *First,* in imposing a tax to support the services a government provides to the public at large, a legislature need not consider the value of particular benefits to a taxpayer, but may assess the tax solely on the basis of taxpayers' ability to pay. *Second* (of perhaps greater concern in the present context), a tax is a powerful regulatory device; a legislature can discourage or eliminate a particular activity that is within its regulatory jurisdiction simply by im-

posing a heavy tax on its exercise. See *National Cable Television Assn.* v. *United States,* 415 U. S. 336, 340–341 (1974). *Collector* v. *Day,* like the earlier *McCulloch* v. *Maryland,* reflected the view that the awesomeness of the taxing power required a flat and absolute prohibition against a tax implicating an essential state function because the ability of the federal courts to determine whether particular revenue measures would or would not destroy such an essential function was to be doubted.

As the contours of the principle evolved in later decisions, "cogent reasons" were recognized for narrowly limiting the immunity of the States from federal imposts. See *Helvering* v. *Gerhardt,* 304 U. S. 405, 416 (1938). The first is that any immunity for the protection of state sovereignty is at the expense of the sovereign power of the National Government to tax. Therefore, when the scope of the States' constitutional immunity is enlarged beyond that necessary to protect the continued ability of the States to deliver traditional governmental services, the burden of the immunity is thrown upon the National Government without any corresponding promotion of the constitutionally protected values. See, *id.,* at 416–417; *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376, 384–385 (1938); *Willcuts* v. *Bunn,* 282 U. S. 216, 225 (1931). The second, also recognized by Mr. Chief Justice Marshall in *McCulloch* v. *Maryland, supra,* at 435–436, is that the political process is uniquely adapted to accommodating the competing demands "for national revenue, on the one hand, and for reasonable scope for the independence of state action, on the other," *Helvering* v. *Gerhardt, supra,* at 416: The Congress, composed as it is of members chosen by state constituencies, constitutes an inherent check against the possibility of abusive taxing of the States by the National Government.[13]

---

[13] Although the opinion for the Court in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), rejects the argument that the operation of the political process eliminates any reason for reviewing federalism-based

In tacit, and at times explicit, recognition of these considerations, decisions of the Court either have declined to enlarge the scope of state immunity or have in fact restricted its reach. Typical of this trend are decisions holding that the National Government may tax revenue-generating activities of the States that are of the same nature as those traditionally engaged in by private persons. See, e. g., *New York* v. *United States,* 326 U. S. 572 (1946) (tax on water bottled and sold by State upheld); *Allen* v. *Regents,* 304 U. S. 439 (1938) (tax on admissions to state athletic events approved notwithstanding use of proceeds for essential state functions); *Helvering* v. *Powers,* 293 U. S. 214 (1934) (tax on operations of railroad by State); *Ohio* v. *Helvering,* 292 U. S. 360 (1934) (tax on state liquor operation); *South Carolina* v. *United States,* 199 U. S. 437 (1905) (tax on state-run liquor business). It is true that some of the opinions speak of the state activity taxed as "proprietary" and thus not an immune essential *governmental* activity, but the opinions of the Members of the Court in *New York* v. *United States, supra,* the most recent decision, rejected the governmental-proprietary distinction as untenable.[14] Rather the majority [15] reasoned that a nondiscriminatory tax

challenges to federal regulation of the States *qua* States, we do not believe it follows that the existence of "political checks" has no relevance to a determination of the proper *scope* of a State's immunity from federal taxation. We have regularly relied upon the existence of such political checks in considering the scope of the National Government's immunity from state taxation. See, e. g., *United States* v. *County of Fresno,* 429 U. S. 452 (1977).

[14] All eight Justices who participated in the case indicated that they regarded the governmental-proprietary distinction as an untenable one. See 326 U. S., at 579–581 (opinion of Frankfurter, J., joined by Rutledge, J.); *id.,* at 586 (Stone, C. J., concurring, joined by Reed, Murphy, and Burton, JJ.); and *id.,* at 591 (Douglas, J., dissenting, joined by Black, J.).

[15] In *New York* v. *United States,* Mr. Justice Frankfurter announced the judgment of the Court and an opinion joined by only one of the eight Justices participating in the case. That opinion upheld the tax on a

may be applied to a state business activity where, as was the case there, the recognition of immunity would "accomplish a withdrawal from the taxing power of the nation a subject of taxation of a nature which has been traditionally within that power from the beginning. Its exercise . . . by a nondiscriminatory tax, does not curtail the business of the state government more than it does the like business of the citizen." 326 U. S., at 588–589 (Stone, C. J., concurring).

Illustrative of decisions actually restricting the scope of the immunity is the line of cases that culminated in the overruling of *Collector* v. *Day* in *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939). See, *e. g., Helvering* v. *Gerhardt, supra; Helvering* v. *Mountain Producers Corp., supra; Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514 (1926). *Collector* v. *Day,* of course, involved a nondiscriminatory tax that was imposed not directly on the State but rather on the salary earned by a judicial officer. Neither *Collector* v. *Day* itself nor its progeny or precursors made clear how such a taxing measure could be employed to preclude the States from performing essential functions. In any case, in the line of decisions that culminated in *Graves* v. *New York ex rel. O'Keefe, supra,* the Court demonstrated that an immunity for the salaries paid key state officials is not justifiable. Although key state officials are agents of the State, they are also citizens of the United States, so their income is a natural subject for income taxation. See *Helvering* v. *Gerhardt, supra,* at 420 and 422.

More significantly, because the taxes imposed were nondiscriminatory and thus also applicable to income earned by persons in private employment, the risk was virtually nonexistent that such revenue provisions could significantly impede a State's ability to hire able persons to perform its essential

broader ground than the concurring opinion of Mr. Chief Justice Stone, joined by three Justices. We therefore conclude that a majority supported the Chief Justice's rationale.

functions. See *Graves* v. *New York ex rel. O'Keefe, supra,* at 484–485; *Helvering* v. *Gerhardt, supra,* at 420–421. The only advantage conceivably to be lost by denying the States such an immunity is that essential state functions might be obtained at a lesser cost because employees exempt from taxation might be willing to work for smaller salaries. See 304 U. S., at 420–421. But that was regarded as an inadequate ground for sustaining the immunity and preventing the National Government from requiring these citizens to support its activities. See *Graves* v. *New York ex rel. O'Keefe, supra,* at 483 and cases cited in n. 3. The purpose of the implied constitutional restriction on the national taxing power is not to give an advantage to the States by enabling them to engage employees at a lower charge than those paid by private entities, see *Helvering* v. *Gerhardt, supra,* at 421–422, but rather is solely to protect the States from undue interference with their traditional governmental functions. While a tax on the salary paid key state officers may increase the cost of government, it will no more preclude the States from performing traditional functions than it will prevent private entities from performing their missions. See *Graves* v. *New York ex rel. O'Keefe, supra,* at 484–485; *Helvering* v. *Gerhardt, supra,* at 420–421.

These two lines of decisions illustrate the "practical construction" that the Court now gives the limitation the existence of the States constitutionally imposes on the national taxing power; "that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax . . . or the appropriate exercise of the functions of the government affected by it." *New York* v. *United States,* 326 U. S., at 589–590 (Stone, C. J., concurring) quoting *Metcalf & Eddy* v. *Mitchell, supra,* at 523–524. Where the subject of tax is a natural and traditional source of federal revenue and where it is inconceivable that such a revenue measure could ever operate to preclude traditional

state activities, the tax is valid. While the Court has by no means abandoned its doubts concerning its ability to make particularized assessments of the impact of revenue measures on essential state operations, compare *New York* v. *United States, supra,* at 581 (opinion of Frankfurter, J.)[16] with 326 U. S., at 590 (Stone, C. J., concurring),[17] it has recognized that some generic types of revenue measures could never seriously threaten the continued functioning of the States and hence are outside the scope of the implied tax immunity.

## B

A nondiscriminatory taxing measure that operates to defray the cost of a federal program by recovering a fair approximation of each beneficiary's share of the cost is surely no more offensive to the constitutional scheme than is either a tax on the income earned by state employees or a tax on a State's sale of bottled water.[18] The National Government's interest in being compensated for its expenditures is only too apparent. More significantly perhaps, such revenue measures by their very nature cannot possess the attributes that led Mr. Chief Justice Marshall to proclaim that the power to tax is the power

---

[16] "Any implied limitation upon the supremacy of the federal power to levy a tax like that now before us, in the absence of discrimination against State activities, brings fiscal and political factors into play. The problem cannot escape issues that do not lend themselves to judgment by criteria and methods of reasoning that are within the professional training and special competence of judges."

[17] "Since all taxes must be laid by general, that is, workable, rules, the effect of [state] immunity on the national taxing power is to be determined not quantitatively but by its operation and tendency in withdrawing taxable property or activities from the reach of federal taxation."

[18] As is implicit from our summary of the development of the law of state tax immunity, this doctrine does not inflexibly require the invalidation of any revenue measure that is labeled or operates as a tax. That § 4491 is called or can be characterized as a "tax" thus possesses no talismanic significance. We observe, moreover, that Congress did regard § 4491 as a user fee.

to destroy. There is no danger that such measures will not be based on benefits conferred or that they will function as regulatory devices unduly burdening essential state activities. It is, of course, the case that a revenue provision that forces a State to pay its own way when performing an essential function will increase the cost of the state activity. But *Graves* v. *New York ex rel. O'Keefe,* and its precursors, see 306 U. S., at 483 and the cases cited in n. 3, teach that an economic burden on traditional state functions without more is not a sufficient basis for sustaining a claim of immunity. Indeed, since the Constitution explicitly requires States to bear similar economic burdens when engaged in essential operations, see U. S. Const., Amdts. 5, 14; *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922) (State must pay just compensation when it "takes" private property for a public purpose); U. S. Const., Art. I, § 10, cl. 1; *United States Trust Co.* v. *New Jersey,* 431 U. S. 1 (1977) (even when burdensome, a State often must comply with the obligations of its contracts), it cannot be seriously contended that federal exactions from the States of their fair share of the cost of specific benefits they receive from federal programs offend the constitutional scheme.

Our decisions in analogous contexts support this conclusion. We have repeatedly held that the Federal Government may impose appropriate conditions on the use of federal property or privileges and may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs. See, *e. g., Ivanhoe Irrigation Dist.* v. *McCracken,* 357 U. S. 275, 294–296 (1958); *Oklahoma* v. *Civil Service Comm'n,* 330 U. S. 127, 142–144 (1947); *United States* v. *San Francisco,* 310 U. S. 16 (1940); cf. *National League of Cities* v. *Usery,* 426 U. S. 833, 853 (1976); *Fry* v. *United States,* 421 U. S. 542 (1975). A requirement that States, like all other users, pay a portion of the costs of the benefits they enjoy from federal programs is surely permissible since it is closely related to the

federal interest in recovering costs from those who benefit and since it effects no greater interference with state sovereignty than do the restrictions which this Court has approved.

A clearly analogous line of decisions is that interpreting provisions in the Constitution that also place limitations on the taxing power of government. See, e. g., U. S. Const., Art. I, § 8, cl. 3 (restricting power of States to tax interstate commerce); § 10, cl. 3 (prohibiting any state tax that operates "to impose a charge for the privilege of entering, trading in, or lying in a port." Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n, 296 U. S. 261, 265–266 (1935)). These restrictions, like the implied state tax immunity, exist to protect constitutionally valued activity from the undue and perhaps destructive interference that could result from certain taxing measures. The restriction implicit in the Commerce Clause is designed to prohibit States from burdening the free flow of commerce, see generally Complete Auto Transit, Inc. v. Brady, 430 U. S. 274 (1977), whereas the prohibition against duties on the privilege of entering ports is intended specifically to guard against local hindrances to trade and commerce by vessels. See Packet Co. v. Keokuk, 95 U. S. 80, 85 (1877).

Our decisions implementing these constitutional provisions have consistently recognized that the interests protected by these Clauses are not offended by revenue measures that operate only to compensate a government for benefits supplied. See, e. g., Clyde Mallory Lines v. Alabama, supra (flat fee charged each vessel entering port upheld because charge operated to defray cost of harbor policing); Evansville-Vanderburgh Airport Authority v. Delta Airlines, Inc., 405 U. S. 707 (1972) ($1 head tax on enplaning commercial air passengers upheld under the Commerce Clause because designed to recoup cost of airport facilities). A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost and, provided that the charge is structured to compensate the government for the benefit conferred, there can be no danger of the kind of interference

with constitutionally valued activity that the Clauses were designed to prohibit.

## C

Having established that taxes that operate as user fees may constitutionally be applied to the States, we turn to consider the Commonwealth's argument that § 4491 should not be treated as a user fee because the amount of the tax is a flat annual fee and hence is not directly related to the degree of use of the airways.[19] This argument has been confronted and rejected in analogous contexts. *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542 (1950), is illustrative. There the Court rejected an attack under the Commerce Clause on an annual Maryland highway tax of "2% upon the fair market value of motor vehicles used in interstate commerce." The carrier argued that the correlation between the tax and use was not sufficiently precise to sustain the tax as a valid user charge. Noting that the tax "should be judged by its result, not its formula, and must stand unless proven to be unreasonable in amount for the privilege granted," *id.,* at 545, the Court rejected the carrier's argument:

> "Complete fairness would require that a state tax formula vary with every factor affecting appropriate compensation for road use. These factors, like those relevant in considering the constitutionality of other state taxes, are so countless that we must be content with 'rough approximation rather than precision.' . . . Each additional factor adds to administrative burdens of

---

[19] Only a few words are needed to reject the Commonwealth's suggestion that the United States may not impose this tax under a user-fee rationale because the United States has no proprietary interest in the airports and airways of the United States. Quite simply, we think there is no basis for the position that user fees are constitutional only when the United States has some sort of a right of property. A user-fee rationale may be invoked whenever the United States is recovering a fair approximation of the cost of benefits supplied.

enforcement, which fall alike on taxpayers and government. We have recognized that such burdens may be sufficient to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers. . . . Upon this type of reasoning rests our general rule that taxes like that of Maryland here are valid unless the amount is shown to be in excess of fair compensation for the privilege of using state roads." *Id.*, at 546–547. (Citations and footnotes omitted.)

See also *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947) (taxes of $10 and $15 per vehicle sustained against Commerce Clause challenges); *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n, supra* (flat fee designed to defray cost of policing port upheld against claim it was constitutionally prohibited tax on privilege of entering harbor). This Court recently relied upon this reasoning to uphold a tax on commercial aviation activity. In *Evansville-Vanderburgh Airport Authority* v. *Delta Airlines, Inc., supra,* we sustained against claims based on the Commerce Clause and on the right to travel a $1 head tax on commercial airline passengers. We held that such taxes are valid so long as they (1) do not discriminate against interstate commerce, (2) are based upon some fair approximation of use, and (3) are not shown to be excessive in relation to the cost to the government of the benefits conferred. 405 U. S., at 716–720.

The Commonwealth, of course, recognizes that flat fees, and even flat annual fees, have been held constitutionally permissible in these contexts. It urges, however, that such "rough approximations of cost," while appropriate compensatory measures in other settings, should not be permissible here. It maintains that the values protected by the doctrine of state tax immunity require that any user tax be closely calibrated

to the amount of any taxpayer's actual use, and it suggests that we—for purposes of the state tax immunity doctrine only—define user fees as charges for measurable amounts of use of government facilities.

We note first that it is doubtful that the National Government could recover the costs of its aviation activities from those direct beneficiaries without making at least some use of annual flat fees. In arguing that the Revenue Act provisions are not sufficiently user related, the Commonwealth places extensive reliance upon the DOT Study, prepared at the direction of Congress,[20] of the best way to recoup the costs of the federal aviation activities from its beneficiaries. While the report recognized that it would be generally possible, albeit costly in the case of general aviation, to tie the charges to specific measurable benefits received, see DOT Study 61, it indicated that certain costs imposed by general aviation could only be recovered through flat fees. *Id.,* at 61 n. 2.

But even if it were feasible to recover all costs through charges for measurable amounts of use of Government facilities, we fail to see how such a requirement would appreciably advance the policies embodied in the doctrine of state tax immunity. Since a State has no constitutional complaint when it is required to pay the cost of benefits received, the Commonwealth's only legitimate fear is that the flat-fee requirement may result in the collection from it of more than its actual "fair share." We observe first that where the

---

[20] Provisions in both the Development Act and the Revenue Act directed the Department of Transportation to conduct a study of how best to recover the costs imposed on the national airsystem by each class of users. See § 4 of the Development Act, 84 Stat. 220, 49 U. S. C. § 1703; § 209 of the Revenue Act, 84 Stat. 252. The existence of these provisions underscores the fact, which is further illustrated by the fact that the taxes imposed by the Revenue Act expire in 1980, see, *e. g.,* 26 U. S. C. § 4491 (e), that Congress regarded the Revenue Act user fees as an interim approach to the recovery of aviation costs from their beneficiaries.

charges imposed by the Federal Government apply to large numbers of private parties as well as to state activities, it is as likely as not that the user fee will result in exacting less money from the State than it would have to pay under a perfect user-fee system. More fundamentally, even when an annual flat fee results in some overcharges, the Commonwealth's solution would often increase the fiscal burden on the States. If the National Government were required more precisely to calibrate the amount of the fee to the extent of the actual use of the airways, administrative costs would increase and so would the amount of revenue needed to operate the system. The resulting increment in a State's actual fair share might well be greater than any overcharge resulting from the present fee system. But the complete answer to the Commonwealth's concern is that even if the flat fee does cost it somewhat more than it would have to pay under a perfect user-fee system, there is still no interference with the values protected by the implied constitutional tax immunity of the States. The possibility of a slight overcharge is no more offensive to the constitutional structure than is the increase in the cost of essential operations that results either from the fact that those who deal with the State may be required to pay nondiscriminatory taxes on the money they receive or from the fact a jury may award an eminent domain claimant an amount in excess of what would be "just compensation" in an ideal system of justice.

Whatever the present scope of the principle of state tax immunity, a State can have no constitutional objection to a revenue measure that satisfies the three-prong test of *Evansville-Vanderburgh Airport Authority* v. *Delta Airlines, Inc.*—substituting "state function" for "interstate commerce" in that test. So long as the charges do not discriminate against state functions, are based on a fair approximation of use of the system, and are structured to produce revenues that will not exceed the total cost to the Federal Government of the benefits

to be supplied, there can be no substantial basis for a claim that the National Government will be using its taxing powers to control, unduly interfere with, or destroy a State's ability to perform essential services. The requirement that total revenues not exceed expenditures places a natural ceiling on the total amount that such charges may generate and the further requirement that the measure be reasonable and nondiscriminatory precludes the adoption of a charge that will unduly burden state activities.[21]

## III

Applying these principles to this case demonstrates that the Commonwealth's claim of constitutional immunity is particularly insubstantial. First, there is no question but that the tax imposed by § 4491 is nondiscriminatory. It applies not only to private users of the airways but also to civil aircraft operated by the United States—facts which minimize, if not eliminate entirely, the basis for a conclusion that § 4491 might be an abusive exercise of the taxing power. Indeed, the Revenue Act discriminates in favor of the States since it retains the States' exemption from the 7-cent-per-gallon fuel tax that applies to private noncommercial general aviation—a fact that illustrates the manner in which the political process is peculiarly adapted to the protection of state interests.

Second, the tax satisfies the requirement that it be a fair approximation of the cost of the benefits civil aircraft receive from the federal activities. As we have indicated, the legislative background and terms of the Revenue Act indicate that

---

[21] Our Brother REHNQUIST's characterization of this test (which the United States urged us to adopt, see Brief for United States 19–20) as "vague and convoluted" see *post*, at 472, overlooks its consistent applications for years by the Court, without any apparent difficulty, in cases involving the negative implications of the Commerce Clause. It further overlooks that, as our experience today indicates, see Part III, *infra*, there is no reason to suppose that the Court will have any different experience in applying this test in cases involving a State's claim of immunity from federal taxation.

Congress believed that four measures, taken together, would fairly reflect some of the cost of the benefits that redound to the noncommercial general aircraft that fly in the navigable airspace of the United States: a 7-cent-per-gallon fuel tax, a 5-cent-per-pound tax on aircraft tires, a 10-cent-per-pound tax on tubes, see 26 U. S. C. § 4071, and the annual aircraft registration tax. See nn. 4 and 8, *supra.* The formula contained in these four measures taken together does not, of course, give weight to every factor affecting appropriate compensation for airport and airway use. A probable deficiency in the formula arises because not all aircraft make equal use of the federal navigational facilities or of the airports that have been planned or constructed with federal assistance. But the present scheme nevertheless is a fair approximation of the cost of the benefits each aircraft receives. Every aircraft that flies in the navigable airspace of the United States has available to it the navigational assistance and other special services supplied by the United States.[22] And even those aircraft, if there are any, that have never received specific services from the National Government benefit from them in the sense that the services are available for their use if needed and in that the provision of the services makes the airways safer for all users.[23] The four taxes, taken together, fairly

---

[22] Although a helicopter may be expected to make less intensive use of the federal facilities and services than would an airplane, the Commonwealth has not denied that its state police helicopter has made some use of the federal services, and it conceded as much at oral argument. See Tr. of Oral Arg. 20. In any case, the Commonwealth has indicated that its submission in the case at bar does not depend in any way on the fact that a helicopter is involved, but rather is equally applicable to all aircraft. *Ibid.*

[23] Because aircraft do not invariably use the federal services each time they fly, the Commonwealth suggests that the case at bar is analogous to *Cannon* v. *New Orleans,* 20 Wall. 577 (1874). There, this Court held that when an ordinance taxed the use of wharves or riverbanks indiscriminately, rather than only the use of wharves built by the city, the

reflect the benefits received, since three are geared directly to use, whereas the fourth, the aircraft registration tax, is designed to give weight to factors affecting the level of use of the navigational facilities. See n. 9, *supra.* A more precisely calibrated formula—which would include landing fees, charges for specific services received, and less reliance on annual flat fees, see DOT Study 62—would, of course, be administratively more costly.

It follows that a State may not complain of the application of § 4491 on the ground it is not a fair approximation of use. Since the fuel tax, tire and tube tax, and annual registration fee together constitute an appropriate means of recovering the amount of the federal investment, a State, being exempt from the fuel, tire, and tube taxes, can have no constitutional objection to the application of the registration fee alone.

Finally, the tax is not excessive in relation to the cost of the Government benefits supplied. When Congress enacted the Revenue Act, it contemplated that the user fees imposed on civil aircraft would not be sufficient to cover the federal expenditures on civil aviation in any one year, see n. 4, *supra,* and the actual experience during the first years of operation was that the revenues fell far short of covering the annual civil aviation outlays.[24] Since the Commonwealth pays far

exaction could not be justified as compensation for use of municipal facilities or services. What distinguishes the case at bar is that the federal services are directed at the entire navigable airspace of the United States and inure to the benefit of all users. The analogous decision is *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n,* 296 U. S. 261 (1935), in which the Court held that a vessel that has not been the recipient of any police services could be required to pay a charge designed to defray their costs since the services redounded to the benefit of all vessels in the port.

[24] The DOT Study, which the Commonwealth asks us judicially to notice, concludes that the system of user fees has not come close to recovering the costs imposed on the national airsystem by the civil users of the airways in the first years of the program. *Id.,* at 43. Indeed, it finds that the greatest shortfall is the revenue produced by the charges imposed on gen-

less than private noncommercial users of the airways, there therefore is no basis for a conclusion that the application of the registration tax to the States produces revenues in excess of the costs[25] incurred by the Federal Government.[26]

*Affirmed.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART and MR. JUSTICE POWELL, concurring in part and concurring in the judgment.

The petitioner has conceded that a nondiscriminatory user fee may constitutionally be imposed upon a State, and, for substantially the reasons stated in Part II–B of the plurality opinion, we agree. Moreover, we agree with the Court that

eral aviation, a category that, of course, includes the Commonwealth's aircraft. See *id.*, at 43–50.

[25] Even if the revenues in any one year exceeded the outlays, it would not follow that the tax is invalid as applied. In *Evansville-Vanderburgh Airport Authority* v. *Delta Airlines, Inc.*, 405 U. S. 707, 719–720 (1972), we indicated that the validity of the tax was determined by comparing total revenue with total outlays: *i. e.*, a surplus of revenue over outlays in any one year can be offset against actual deficits of past years and perhaps against projected deficits of future years.

[26] We regard our Brother REHNQUIST's view that the record does not support a conclusion that § 4491 is a user fee as perhaps another way of stating disagreement with our understanding of the governing legal principles. Compare *supra*, at 463 n. 19, and 467–469, with *post*, at 473–474. For under our view of those principles, there plainly is no basis to remand for an evidentiary hearing. In light of the undisputed nature of the tax and the Commonwealth's reliance upon the DOT Study, there is no basis for a dispute among the parties concerning the operation of § 4491, the nature of the services that the United States supplies for the benefit of all users of the airways, or the relationship between the revenues from the various user fees and the federal expenditures on the national airsystem. In this circumstance the record amply justifies our conclusion that each prong of the *Evansville-Vanderburgh Airport Authority* v. *Delta Airlines, Inc.*, test is satisfied.

the aircraft registration tax imposed by 26 U. S. C. § 4491 is such a user fee. We therefore see no need to discuss the general contours of state immunity from federal taxation, as the plurality does in Part II–A of its opinion.

On this basis we join Parts I, II–C, and III of the Court's opinion and concur in its judgment.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

Petitioner, the Commonwealth of Massachusetts, brought suit against the United States to recover a charge of $131.43 plus penalties and interest imposed upon it by reason of its use of a helicopter in connection with its state police force. The United States moved to dismiss petitioner's complaint, and its motion was granted by the District Court for the District of Massachusetts. The Court of Appeals for the First Circuit affirmed that judgment, but expressly chose to do so on a narrower ground than that relied upon by the District Court. 548 F. 2d 33, 34 (1977). The Court of Appeals found it unnecessary to examine the law of intergovernmental tax immunity, because it concluded that the charge imposed here "is, in reality, a user charge." *Id.,* at 35. While the Court of Appeals recognized that the labeling of an assessment as a user charge is not of itself conclusive, cf. *Packet Co.* v. *Keokuk,* 95 U. S. 80, 86 (1877), it quoted the following language in explaining its understanding of the distinction between a tax and a user charge:

> " 'It is a tax or duty that is prohibited: something imposed by virtue of sovereignty, not claimed in right of proprietorship. Wharfage is of the latter character. Providing a wharf to which vessels may make fast, or at which they may conveniently load or unload, is rendering them a service. . . . [A]nd, when compensation is demanded for the use of the wharf, the demand is an assertion, not of sovereignty, but of a right of property.' " 548 F. 2d, at 36, quoting *Packet Co.* v. *Keokuk, supra,* at 85.

The United States has defended its judgment in this Court solely on the basis that the Court of Appeals was correct in concluding that the exaction in question was a user charge. Its brief states:

"[T]his case presents no occasion to consider the present status of the doctrine of implied constitutional immunity of the states from federal taxation. Here, the annual excise tax on the use of civil aircraft is not a tax subject to any constitutional restrictions but is simply a required payment by the user for airport and airway facilities funded or provided by the federal government. Petitioner can no more claim the right to free use of these facilities than it could, for example, use the postal service without purchasing stamps." Brief for United States 6-7.

It is therefore somewhat surprising to find Part II-A of today's opinion (which reflects the views of only four Justices) discussing at length the scope of intergovernmental tax immunity. Petitioner insists that it may be able to prove at a trial of the action that the charge is not in fact a user fee; the United States insists that it is a user fee, apparently as a matter of law. This is the issue before the Court, and the only issue before it.

I agree that the United States would have a valid defense to this action if it had established, or could establish, that the charge imposed was reasonably related to services rendered to the petitioner by agencies of the Federal Government. I further conclude that the United States would have a valid defense to this action if it could establish that the charge was based on use by the petitioner of some property which the United States owned or in which it had some other type of proprietary interest. Cf. *Packet Co.* v. *Keokuk, supra,* at 84-85. I am at a loss to know why the Court feels obligated to draw on cases decided under the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, to establish its vague and convoluted

three-part test to determine whether the user fee is valid, since cases regarding intergovernmental relations raise significantly different considerations. Commerce Clause cases, while no doubt useful analogies, are not required to deal with the fact that the payer of the user fee is a State in our constitutional structure, and that its essential sovereign interests are entitled to greater deference than is due to ordinary business enterprises which may be regulated by both State and Federal Governments. Since the United States concedes that the absence of intergovernmental immunity to user fees is a reciprocal one, Tr. of Oral Arg. 26–28, it stands to lose as much from the vagueness of the Court's test as do petitioner and its sister States.

Regardless of the phrasing of the test, I cannot accept the Court's conclusion that the Commonwealth need not be given the opportunity to prove that the test has not been satisfied. The Court, relying heavily on our opinion in *Evansville-Vanderburgh Airport Authority* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972), holds that the fee need not be precisely calibrated to the value of the service furnished so long as it is not shown to be excessive in relation to the cost to the United States of the benefits conferred. *Ante*, at 466–467. But in the cases considered in that opinion, the Court explicitly noted that the challengers had been given the chance to prove the fee excessive and had failed to do so. 405 U. S., at 720. In addition, there was no doubt that the municipal corporations which sought to impose the head tax in fact owned the airport facilities, nor that passengers who were paying the head tax were taking advantage of the services provided by those facilities.

Neither of those conclusions can be reached as a matter of law on the record before us. The United States does not "own" the airspace above its territorial boundaries, although it undoubtedly has considerable authority to regulate the use of that airspace. Nor does the United States, so far as this record shows, "own" any of the facilities which are used by

the helicopter in question. Indeed, it is not even clear from this record whether the helicopter in question has made use of any of the services, such as air traffic controllers, which are furnished by the United States to those who make use of the airways. Were any of these facts to be found to exist by a finder of fact, I might well concur in the Court's judgment. I cannot, under my view of the law, accept as a substitute for such factual findings House and Senate Reports which merely state that a tax of this kind is " 'generally viewed as a user charge.' " *Ante,* at 449 n. 6, quoting H. R. Rep. No. 91–601, p. 46 (1969).

The Court's reliance upon *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n,* 296 U. S. 261 (1935), which arose under the Duty of Tonnage Clause of the Constitution, Art. I, § 10, cl. 3, as well as the Commerce Clause, is misplaced in this regard. The Court there held that neither provision was violated by a flat fee which was charged by the State as compensation for the "policing service rendered by the state in the aid of the safe and efficient use of its port." 296 U. S., at 264. The Court held that the vessels were properly liable for the fee despite the fact that they had not received any special assistance, because the evidentiary record affirmatively demonstrated that "[t]he benefits which flow from the enforcement of [the] regulations . . . inure to all who enter [the harbor]." *Id.,* at 266.

It may be that upon further development of the record in this case, by trial or by procedures leading to summary judgment, a situation similar to that in *Clyde Mallory Lines, supra,* could be shown by the United States to exist. But that does not justify the order of the District Court dismissing petitioner's complaint without such development. I would therefore reverse the judgment of the Court of Appeals and remand for further proceedings.