BOWMAN, Circuit Judge,
dissenting, joined by BEAM, LOKEN, and BYE, Circuit Judges.
I respectfully disagree with the Court’s decision. I do so for two separate, independent reasons, either of which, in my view, requires reversal of the District Court. I state them briefly.
First, the financial inducement offered by Congress for the Arkansas Department of Education to waive its Eleventh Amendment immunity with respect to Rehabilitation Act claims is coercive. The Supreme Court explicitly has recognized that financial pressure applied by Congress may “pass the point at which ‘pressure turns into compulsion.’” South Dakota v. Dole, 483 U.S. 203, 211, 107 S.Ct. 2793, 97 *1083 L.Ed.2d 171 (1987) (quoting Steward Mach. Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). In Dole, the Court rejected the argument as to coercion on the ground that South Dakota would lose only 5% of its federal money for highways if South Dakota declined to raise the minimum drinking age to twenty-one as Congress wished. Inasmuch as the condition imposed by Congress placed only a small percentage of the state’s federal money for highways at risk, “the argument as to coercion is shown to be more rhetoric than fact.” Id.
In contrast, here we confront a Congressional directive that places at risk 100% of Arkansas’s federal funding for education— some $250,000,000 a year at last report. This amount of money to support public education could not easily be replaced by Arkansas, and public education undoubtedly would suffer if Arkansas failed to yield the requested waiver of its Eleventh Amendment immunity. The money would have to be shifted from other needy portions of Arkansas’s budget or raised by the imposition of additional taxes. Either course assuredly would present great difficulty. And either way, federal taxpayers in Arkansas would be deprived of the benefits of a return from the federal government to the state of a significant amount of the federal tax monies collected from Arkansans. Moreover, we should not be unmindful of how unpopular and potentially counter-productive it is to increase state taxes when federal taxes (especially when taken in combination with existing state and local taxes) are at a very high level, as they currently are and have been for many years.[1] In sum, the proportion of federal funds for education in Arkansas here placed at risk by the federal scheme (100%), the amount of those funds (some $250,000,000), and the difficulty of making up for the loss of those funds if the State elects not to waive its Eleventh Amendment immunity with respect to Rehabilitation Act claims all lead to the conclusion that pressure has turned into compulsion and that the waiver given by the State is therefore unenforceable.
Second, as our Court held in a portion of the panel opinion not affected by the en banc proceedings in this case, § 504 of the Rehabilitation Act and its related abrogation clause do not abrogate the states’ Eleventh Amendment immunity. That is so because the Rehabilitation Act imposes duties upon the states exceeding those commanded by the Fourteenth Amendment, and thus is beyond the power over the states given to Congress by § 5 of that amendment. For the panel’s complete analysis of this point, see Bradley v. Arkansas Department of Education, 189 F.3d 745, 754-56 (8th Cir.1999). The question then becomes whether Congress, in the guise of Spending Clause legislation, can achieve indirectly what it cannot constitutionally achieve directly. That is, can Congress get its way by presenting the states with the Hobson’s choice of either waiving their Eleventh Amendment immunity from § 504 claims or foregoing all federal funds to support various traditional state activities such as education, highways, and the like? Professor Lynn A. Baker has brilliantly captured the essence of this question:
So long as [Article I, which enumerates all the powers granted to Congress by the original Constitution] is not interpreted to grant Congress plenary power to regulate the states directly, the Tenth Amendment’s reservation to the states of all powers not delegated to the federal government has content and significance. But if the Spending Clause is simultaneously interpreted to permit Congress to seek otherwise forbidden regulatory aims indirectly through a conditional offer of federal funds to the states, the notion of “a federal government of enumerated powers” will have no meaning.
*1084 Lynn A. Baker, Conditional Federal Spending After Lopez, 95 Colum.L.Rev. 1911, 1920 (1995) (footnote omitted). As Professor Baker noted, Justice O’Connor has sounded the same theme:
If the spending power is to be limited only by Congress’ notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives “power to the Congress to tear down the barriers, to invade the states’ jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed.” This, of course, ... was not the Framers’ plan and it is not the meaning of the Spending Clause.
Dole, 483 U.S. at 217, 107 S.Ct. 2793 (O’Connor, J., dissenting) (citation omitted) (quoting United States v. Butler, 297 U.S. 1, 78, 56 S.Ct. 312, 80 L.Ed. 477 (1936)). For the majority of the Court in Dole, the proper way to limit the Spending Clause (besides applying the coercion test) is to require, among other things, that any conditions placed on federal grants to the states be related “to the federal interest in particular national projects or programs.” Id. at 207, 107 S.Ct. 2793 (quoting Massachusetts v. United States, 435 U.S. 444, 461, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978) (plurality opinion)). The Court found that this test was satisfied in Dole inasmuch as the condition imposed by Congress (raising the state’s drinking age to twenty-one) was directly related to the federal interest in safe interstate travel, which the Court found to be “one of the main purposes for which [federal] highway funds are expended.” [2] Id. at 208, 107 S.Ct. 2793.
The kind of finding made in Dole could not plausibly be made in this case. Here, the condition (waiver of Eleventh Amendment immunity with respect to Rehabilitation Act claims) bears no direct relationship (indeed, not even a discernible relationship) to the purpose of most federal grants to the states for education. That purpose, broadly stated, is to improve the overall quality of education. Admittedly, fair, nondiscriminatory treatment for disabled persons is part of the total picture, but it is only a small part. Although it presumably would be permissible for Congress to condition the receipt of any grants it might make specifically for Rehabilitation Act purposes upon a waiver of state immunity from § 504 claims — a normal quid pro quo — it is not permissible to condition the receipt of other, unrelated federal grants for education upon such a waiver. Conditions on the receipt of federal funds always must “bear some relationship to the purpose of the federal spending; otherwise, of course, the spending power could render academic the Constitution’s other grants and limits of federal authority.” New York v. United States, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (citation omitted). Thus, because the condition imposed in this case is overbroad, going as it does to all federal funds received by the Arkansas Department of Education, no matter what the particular purpose of the funds, the State’s waiver of its Eleventh Amendment immunity has not been validly exacted.
For either or both of the reasons outlined above, I would hold that plaintiffs’ § 504 claim against the Arkansas Department of Education should be dismissed as barred by the Eleventh Amendment. Accordingly, I would reverse the decision of the District Court allowing the suit to go forward on this claim.
Over the past several years, the Supreme Court in a series of cases has rigorously applied the constitutional prohibition against Congress’s use of its Article I powers as a basis for abrogating the Eleventh Amendment immunity of the states. See Kimel v. Fla. Bd. of Regents, 528 U.S. 62, *1085 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (holding that Age Discrimination in Employment Act did not validly abrogate states’ Eleventh Amendment immunity from individual suits because abrogation exceeded Congress’s authority under § 5 of Fourteenth Amendment, and reiterating that no such authority exists under Article I); Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (holding that congressional attempt to abrogate states’ sovereign immunity from patent infringement claims under Patent and Plant Variety Protection Remedy Clarification Act was invalid exercise of Article I commerce or patent powers and not justified under Fourteenth Amendment § 5 enforcement powers); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (holding that Congress did not abrogate states’ Eleventh Amendment immunity from suit under Trademark Remedy Clarification Act because Act identified no property right protected by Fourteenth Amendment, whose § 5 enforcement powers were only possible basis for purported abrogation); Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding, in seminal case, that Indian Gaming Regulatory Act could not abrogate states’ sovereign immunity as exercise of Congress’s power under Indian Commerce Clause because Article I powers could not circumvent Eleventh Amendment restrictions on Article III judicial power).
The Court’s holdings in these cases reflect the rock-solid principle that Eleventh Amendment immunity trumps any exercise of the powers of Congress enumerated in the original Constitution; controlling weight must be given to the provision that became part of the Constitution later in time. I am struck, however, by how easy it would be, if the majority of our Court has decided this case correctly, for Congress to overcome this limitation on its power. By resort to the spending power (another Article I power, by the way), Congress could achieve indirectly the same abrogation of Eleventh Amendment immunity it could not achieve directly. Congress could do this by the simple expedient of coupling an abrogation provision with a provision conditioning the states’ receipt of any or all federal funds upon the states’ waiver of Eleventh Amendment immunity with respect to whatever sorts of claims Congress might specify. Given the financial and political reality within which state governments struggle to fund their operations adequately, most if not all of the states would yield. The same scenario could unfold with respect to other kinds of conditions on the states’ receipt of federal funds, with Congress achieving through the spending power ends it otherwise lacks the constitutional authority to pursue. Truly, the view of the Spending Clause taken by the majority of the Court in today’s decision gives “power to the Congress to tear down the barriers, to invade the states’ jurisdiction, and to become a parliament of the whole people, subject to ho restrictions save such as are self-imposed.” Butler, 297 U.S. at 78, 56 S.Ct. 312. It seems quite clear to me that the Framers never intended the Spending Clause to become an enabling provision for the otherwise unconstitutional exercise of federal power over the states. Yet this is precisely what today’s decision ordains. If our Court will not take a hard look at the anomaly created by a “spending power über alies” mentality, perhaps the Supreme Court will.

. For a scholarly explication of this point, see Lynn A. Baker, Conditional Federal Spending After Lopez, 95 Colum. L.Rev.1911, 1935-39 (1995).

. Justice O’Connor would have found the condition "not sufficiently related to interstate highway construction" and therefore would have held the condition invalid. Dole, 483 U.S. at 214, 107 S.Ct. 2793; see id. at 218, 107 S.Ct. 2793.