John C. MANDEL, Jr., et al., Plaintiffs,

v.

John R. BLOCK, Secretary of Agriculture, et al., Defendants.

No. 83 Civ. 4534 (MEL).

United States District Court,
S.D. New York.

Nov. 3, 1983.

Brashich & Finley, New York City, for plaintiffs; John W. Finley, Jr., New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Janis P. Farrell, Asst. U.S. Atty., Stephen E. Hart, Arthur Goldberg, Attys., Dept. of Justice, New York City, of counsel.

LASKER, District Judge.

Plaintiffs, dairy farmers in New York, Connecticut and Massachusetts, move for a preliminary injunction to restrain the Secretary of Agriculture ("Secretary") from enforcing deductions totaling $1.00 per hundred pounds on the proceeds from sales of all milk marketed commercially in the United States. They contend that the deductions, which the Secretary implemented under the authority of Section 201 of the Agricultural Act of 1949, as amended by Section 101 of the Omnibus Budget Reconciliation Act of 1982, 7 U.S.C. § 1446, are unlawful because 1) the Secretary's actions are both substantively and procedurally defective under applicable administrative law standards, and 2) the deductions violate the Constitution because they constitute a) a tax rather than a valid assessment and b) a taking in violation of the Fifth Amendment. Plaintiffs also move for summary judgment on the constitutional issues. The Secretary cross-moves for summary judgment dismissing the complaint. He argues that imposition of the deductions is a valid exercise of his statutory authority, and that none of plaintiffs' contentions present valid grounds for enjoining the deductions. For the reasons stated below, the motion for a preliminary injunction is denied and the Secretary's motion for summary judgment is granted as to the constitutional issues. Decision on the Secretary's motion for summary judgment is reserved as to the administrative law issues.

## I.

Under the milk price support system established by the Agricultural Act of 1949, (the "Act") 7 U.S.C. § 1421 *et seq.*, the federal government supports the price of milk by purchasing unlimited quantities of butter, cheese and dry milk at prices that are fixed each year by the Secretary. The purchases are made by the Commodity Credit Corporation ("CCC"), a federal corporate entity which is an arm of the Department of Agriculture. The CCC's purchases create a floor for the price of milk by assuring that excess supply will be purchased at a fixed price.

The milk price support program has, in recent years, resulted in huge expenditures. According to the Secretary's figures, in fiscal year 1982 the milk price support program cost approximately $2.3 billion; the milk products purchased by the CCC in the last two marketing years accounted for 10 percent of the milk produced in the United States during those years. *See* 48 Fed.Reg. 3764, 3765–3766 (January 27, 1983). The increasing costs of this overproduction prompted Congress to enact legislation in 1982 authorizing the Secretary to impose a deduction of 50 cents per hundredweight on all commercial sales of milk during the period beginning October 1, 1982 and ending September 30, 1985, if the Secretary estimated that CCC purchases would amount to more than 5 billion pounds of milk during the fiscal year.[1] A second 50 cents per hundredweight deduction by the Secretary was authorized during the period beginning April 1, 1983 and ending September 30, 1985, if the Secretary estimated that CCC purchases would amount to more than 7.5 billion pounds during the fiscal year. If the Secretary implemented the second 50-cent deduction, he was also to establish a refund program by which funds resulting from the deduction would be refunded to those milk producers who reduced their marketings dur-

---

**1.** Pub.L. No. 97–253, § 101, 96 Stat. 763 (1982) (amending 7 U.S.C. § 1446. The statute, in relevant part, provides as follows:

"(d) Notwithstanding any other provision of law—

(1) * * *

(2) Effective for the period beginning October 1, 1982, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Commodity Credit Corporation to offset a portion of the cost of the milk price support program. Authority for requiring such deductions shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 5 billion pounds milk equivalent. If at any time during a fiscal year the Secretary should estimate that such net price support purchases during that fiscal year would be less than 5 billion pounds, the authority for requiring such deduction shall not apply for the balance of the year.

(3)(A) Effective for the period beginning April 1, 1983, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight, in addition to the deduction referred to in paragraph (2), from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Corporation. The deduction authorized by this subparagraph shall be implemented only if the Secretary establishes a program whereby the funds resulting from such deductions would be refunded in the manner provided in this paragraph to producers who reduce their commercial marketings from such marketings during the base period. For the purpose of this paragraph, the base period shall be the fiscal year beginning October 1, 1981, or at the option of the Secretary, the average of the two fiscal years beginning October 1, 1980. The Secretary may make such adjustments in individual bases under this subparagraph as the Secretary determines necessary to correct for abnormal factors affecting production and to reflect such other factors as the Secretary determines should be considered in determining a fair and equitable base.

\* \* \* \* \* \*

(C) The funds remitted to the Corporation as a result of the deductions provided for under this paragraph that are not used in making refunds to producers shall be used to offset the cost of the milk price support program. Authority for making deductions under this paragraph shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 7.5 billion pounds milk equivalent. If at any time during a fiscal year the Secretary should establish that such net price support purchases during that fiscal year would be less than 7.5 billion pounds, the authority for requiring such deductions shall not apply for the balance of the year."

ing the base period established by the Secretary. Proceeds from the first 50-cent deduction, and the portion of the second 50-cent deduction that is not refunded to producers, are to be remitted to the CCC as a partial offset of the costs of the price support program. The 1982 amendments to the Act also established a price support level for CCC purchases of not less than $13.10 per hundredweight of milk containing 3.67 percent milkfat for the period beginning October 1, 1982 and ending September 30, 1984, and provided that the price support level be maintained at a comparable percentage of parity for the 1984 fiscal year. *See* 7 U.S.C. § 1446(d)(1).

On September 24, 1982 the Secretary published a notice in the Federal Register setting the milk price support level at $13.10 for the period October 1, 1982 through September 30, 1983, and announcing that as of December 1, 1982 he would implement the first 50 cents per hundredweight deduction. 47 Fed.Reg. 42,128. The Secretary estimated that CCC purchases of milk products for the year beginning October 1, 1982 would amount to the equivalent of 12.6 billion pounds of milk, radically above the 5 billion pound triggering level set by Congress for implementation of the deduction. *Id.* at 42,129. The Secretary also published a proposed rule establishing a procedure to implement the deduction program, and called for comments on the proposed rule. Over 25,000 comments were received, including petitions containing approximately 23,000 signatures. Most of the comments opposed imposition of the deduction. *See* 47 Fed.Reg. 53,831 (November 30, 1982). On November 30, 1982 the Secretary published a final rule implementing the deduction. *Id.*

In January 1983 the Secretary was enjoined from proceeding with the deduction program by the United States District Court for the Southern District of South Carolina. *See State of South Carolina ex rel. Patrick v. Block,* 558 F.Supp. 1004 (D.S.C.1983). The Court held the Secre-

tary's actions invalid for lack of compliance with the notice and comment procedures of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 553. The Secretary did not appeal the decision. Instead, he published a further notice on January 27, 1983. 48 Fed.Reg. 3764. That notice, which provided a 30-day comment period, announced the Secretary's proposal to collect both of the 50-cent deductions authorized by the Act. On March 17, 1983 the Secretary published a Notice of Determination implementing the first 50 cents per hundredweight deduction, effective April 16, 1983 through September 30, 1983. 48 Fed.Reg. 11,253. The Secretary did not announce implementation of the second 50-cent deduction in the March 17, 1983 Notice of Determination, because he had not yet developed procedures for the refund program which the statute requires if the second 50-cent deduction is to be implemented. However, in a subsequent notice dated May 31, 1983, the Secretary proposed that both 50-cent deductions be collected for the period beginning August 1, 1983 through September 30, 1984. 48 Fed.Reg. 24,085. A final rule implementing those deductions was published on August 2, 1983, and the deductions were made effective September 1, 1983. 48 Fed.Reg. 34,933.[2]

In this litigation plaintiffs challenge both the first 50-cent deduction established in the March 17, 1983 final rule for the period April 1983 through September 1983, and the second $1.00 deduction established in the August 2, 1983 final rule for the period September 1983 through September 1984, and seek a preliminary injunction based on the alleged irreparable harm that the deductions are causing to plaintiffs' financial solvency. As to the constitutional issues, both sides have moved for summary judgment as well, and it is appropriate for this court to merge the inquiry as to the likelihood of plaintiffs' success with the inquiry as to whether summary judgment should be granted, and to reach a final disposition of the matter. As to the APA issues, however, plaintiffs oppose summary judgment.[3]

---

**2.** A final rule implementing a refund procedure in connection with the second 50-cent deduction was published in the Federal Register on August 1, 1983.

**3.** The motions for summary judgment were made orally by both sides during oral argument on plaintiff's application for a preliminary injunction. At the Court's request plaintiffs later

In the interest of an expeditious determination of defendants' motion for preliminary relief, our inquiry on the APA issues is confined to the likelihood of defendants' success on the merits, and decision on the Secretary's motion for summary judgment will be reserved.

## II.

### A. Alleged Violations of the APA

■ Plaintiffs' primary argument concerning the Secretary's alleged violation of the APA is that the Secretary's actions were arbitrary, capricious, and an abuse of discretion, because he assessed the deductions on all producers' sales of milk regardless of whether the producer sells to the CCC. See 5 U.S.C. § 706(2)(A). According to plaintiffs, because the purpose of the legislation authorizing the deduction is to reduce overproduction of milk, the Secretary's failure to target the deductions only to those producers who sell excess milk products to the CCC is irrational. Plaintiffs argue that the determination that the deduction should be imposed is unlawful, not only because plaintiffs do not overproduce, but also because the deductions will force them to increase rather than decrease production to make up for the money lost through the deductions.

These arguments are without merit, because they simply ignore the fact that the legislation authorizing the Secretary to establish the deduction program contains no provision requiring or allowing him to target the deductions selectively among milk producers. The statute permits the Secretary, if he estimates that CCC purchases will exceed a given level, to provide for a deduction "from the proceeds of sale of all milk marketed commercially by producers." See 7 U.S.C. § 1446(d)(2). The plain language of the statute indicates that the Secretary would be exceeding his powers by implementing the deductions on a regional or individual producer basis. The Secretary's failure to implement the deduction program in a manner which would not be within the scope of the authorizing statute is not subject to attack as arbitrary and capricious or as an abuse of discretion.

Plaintiffs also argue that the deduction programs are invalid for the reasons set forth in the June 3, 1983 opinion of the United States District Court for the District of South Carolina, whose discussion plaintiffs incorporate by reference in their memorandum of law. See State of South Carolina ex rel. Tindal v. Block, No. 82–3172–0 (D.S.C. June 3, 1983), reversed, 717 F.2d 874 (4th Cir.1983).[4] That decision enjoined implementation of the first deduction program on grounds of the Secretary's failure to comply with the APA in various respects, primarily: 1) failure to consider, in deciding to implement the deduction program, the same factors that are considered in setting the milk price support level (e.g., the costs of milk production), as well as factors such as the impact of the deduction program on dairy farmers and on the economy; 2) failure to comply fully with the notice and comment provisions of the APA.

The argument that, in deciding whether to impose the deduction programs, the Secretary must base his decision on the same factors as must be considered in setting the milk price support level, rests on a strained interpretation of the statutory provisions. The statutory scheme establishing a system of milk price supports was created by the Agricultural Act of 1949. Factors that the Secretary must consider in setting the price support level each year are set forth in various provisions of the Act, including 7 U.S.C. §§ 1421(b), 1446b and 1446(c).[5]

---

submitted a statement pursuant to Local Rule 3(g), which asserts the existence of factual issues precluding summary judgment as to the administrative law claims. While we are not certain that plaintiffs' 3(g) statement presents genuine issues of material fact, the parties' positions should be more fully developed before the summary judgment motion as to the sufficiency of the administrative action is determined.

**4.** As noted above, the same court had previously enjoined implementation of the 50-cent deduc-

tion announced in the final rule published on November 30, 1982. 47 Fed.Reg. 53,831. See State of South Carolina ex rel. Patrick v. Block, 558 F.Supp. 1004 (D.S.C.1983).

**5.** Section 1421(b) states that in exercising discretionary authority with respect to price support levels for any commodity the Secretary must consider

"(1) the supply of the commodity in relation to the demand therefore, (2) the price levels at

These provisions speak in terms of general economic considerations such as the relationship of supply to demand, or recite the overall Congressional policy behind the milk price support system—*i.e.*, the importance of the dependability of production of dairy products, the goal of stabilizing the income of dairy farmers at a level providing a fair return for their labor and investment, and the like. It is true, as the South Carolina district court noted, that none of these provisions were repealed by the Omnibus Budget and Reconciliation Act of 1982, which for the first time authorized the Secretary to assess deductions from all producers' sales of milk in order to offset some of the costs of the price support program. 7 U.S.C. § 1446(d)(2). Nonetheless, we agree with the Court of Appeals for the Fourth Circuit, which reversed the South Carolina district court's decision, that in authorizing the deduction programs Congress enacted a narrow provision with a specific purpose and set forth in the provision itself the factors which the Secretary was to consider in implementing the deductions. As the Fourth Circuit's decision states:

> "it seems clear that what Congress intended in enacting section 1446(d)(2) was a self-contained, temporary change in the dairy support program in response to the immediate problems of increasing overproduction and the burgeoning costs of the price support system. Congress prefaced section 1446(d)(2) with the phrase '[n]otwithstanding any other provision of law.' It then articulated in Section 1446(d)(2) specific factors the Secretary must consider in deciding to impose the first 50-cent deduction: the overproduction of milk; the cost of the milk price support program; the expected amount of CCC purchases; and the relevant time periods.

\* \* \* \* \* \*

> There is no indication that Congress intended for the Secretary to consider factors contained in other provisions of the Agriculture Act."[6]

At 882–883.

■ Having considered the factors set out in the authorizing statute, the Secre-

---

which other commodities are being supported, and, in the case of feed grains, the feed values of such grains in relation to corn, (3) the availability of funds, (4) the perishability of the commodity, (5) the importance of the commodity to agriculture and the national economy, (6) the ability to dispose of stocks acquired through a price-support operations, (7) the need for offsetting temporary losses of export markets, (8) the ability and willingness of producers to keep supplies in line with demand, and (9) in the case of upland cotton, changes in the cost of producing such cotton."

Section 1446b states:

"Policy with regard to dairy products

"The production and use of abundant supplies of high quality milk and dairy products are essential to the health and general welfare of the Nation; a dependable domestic source of supply of these foods in the form of high grade dairy herds and modern, sanitary dairy equipment is important to the national defense; and an economically sound dairy industry affects beneficially the economy of the country as a whole. It is the policy of Congress to assure a stabilized annual production of adequate supplies of milk and dairy products; to promote the increased use of these essential foods; to improve the domestic source of supply of milk and butterfat by encouraging dairy farmers to develop efficient production units consisting of high-grade, disease-free cattle and modern sanitary equipment; and to stabilize the economy of dairy farmers at a level which will provide a fair return for their labor and investment when compared with the cost of things that farmers buy."

Section 1446(c) provides, in pertinent part

"(c) The price of milk shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs...."

6. The phrase "notwithstanding any other provision of law," which precedes the text of § 1446(d)(2), is a particularly significant indication that Congress intended the factors set forth in § 1446(d)(2) itself to take precedence over other potentially conflicting provisions of the Act. It was not necessary for Congress to repeal the statutory factors relating to the price support system in general in order to enact a limited modification to the program to which a more narrow set of factors is relevant.

tary did not act arbitrarily or capriciously in failing to consider other factors relevant only in setting the milk price support level, or other general factors not mentioned in the legislation at all.[7]

 We also find unconvincing plaintiffs' argument that the Secretary failed to comply with the notice and comment provisions of the APA. As to notice, the Secretary announced and described his proposal, and provided a comment period before implementing both deduction programs. *See* 48 Red.Reg. 3764 (January 27, 1983); 48 Fed.Reg. 24,085 (May 31, 1983). In the final notices implementing each deduction program, the Secretary stated that he had considered the comments submitted, and referred to the major points raised in the comments in discussing the reasons for his decision. Although the Secretary is required to consider public comments, he is not required to respond in detail to every point raised in them. *See, e.g., Consumers Union of United States v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2d Cir.1974) ("a formal opinion specifically covering all rejected alternatives is not required in an informal rule making proceeding"); *see also Home Box Office Inc. v. Federal Communications Commission,* 567 F.2d 9, 35–36 & n. 58 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Particularly in circumstances such as those presented here, where the Secretary is exercising a narrowly-defined authority as to which a limited number of factors are relevant, an exhaustive discussion of the comments received is not a prerequisite to action by the Secre-

tary. In sum, plaintiffs have not shown a likelihood of success as to their claim that the Secretary's actions are invalid for lack of compliance with the notice-and-comment provisions of the APA.[8]

**B. *Alleged Constitutional Violations***

 Plaintiffs argue that the deductions established by the Secretary constitute a tax rather than a regulatory measure or fee, and that therefore the deductions have been unconstitutionally imposed because Congress may not delegate its taxing power. Plaintiffs argue that the deductions are not a legitimate fee because they have been assessed against all milk producers to offset the CCC's costs, rather than only against those producers who benefit from the CCC's activities by selling milk products to the CCC. In support of their argument that this factor distinguishes a tax from a fee plaintiffs rely on language in *National Cable Television Assn. Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974):

> "Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, *e.g.,* a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the

---

7. In fact, as the Fourth Circuit's decision notes, the Secretary "ranged over a broader spectrum of considerations in deciding to exercise his discretion to impose the 50-cent deduction" than is strictly mandated by the authorizing statute. At 884. *See e.g.,* 48 Fed.Reg. at 3765–66 (January 27, 1983) ("Initial Regulatory Flexibility Impact Analysis"); 48 Fed.Reg. at 34,937 (August 2, 1983).

8. Plaintiffs also argue that the deductions are invalid because the Secretary has not submitted a report analyzing the milk price support system and suggesting possible new programs for controlling surpluses of milk, as required by the Agricultural and Food Act of 1981, P.L. 97–98,

§ 107, 95 Stat. 1213, 1220 (1981), codified at 7 U.S.C. § 1446c–1 note. Under that provision, the Secretary was to have submitted such a report to the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition and Forestry by December 31, 1982, which apparently has not been done. However, nothing in that provision indicates that submission of the report is a prerequisite to any other exercise of the Secretary's authority, nor does the statute authorizing the deduction programs make any reference to the necessity of the submission of this report. Accordingly, the failure to file the report provides no basis for invalidating the deduction programs.

applicant, not shared by other members of society."

*Id.* at 340–41, 94 S.Ct. at 1149. In *National Cable Television Assn.* the Court held that the Federal Communications Commission ("FCC"), in assessing fees upon community antenna television ("CATV") systems, could not charge a fee which covered the entire cost of the FCC's CATV regulatory operations, since the FCC's regulation benefited not only the CATV's but the general public as well. *See also Federal Power Commission v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) (companion case).

The plaintiffs' reliance upon *National Cable Television* is misplaced. First, the deductions at issue here offset only a small portion of the CCC's operating costs, unlike the FCC's assessments against the CATV's, which covered the entire estimated costs of the regulatory program. Second, we agree with the Fourth Circuit that the deductions at issue here are regulatory in nature, and as such do not represent an exercise of the taxing power. The circumstances here are strikingly similar to those at issue in *Morrison Milling Co. v. Freeman*, 365 F.2d 525 (D.C.Cir. 1966) *cert. denied*, 385 U.S. 1024, 87 S.Ct. 741, 17 L.Ed.2d 672 (1967), in which the USDA required wheat processors to purchase certificates from the USDA in order to process wheat, and the proceeds were used to guarantee minimum prices for wheat growers. In rejecting the argument that the required purchases of certificates constituted a tax, the court stated:

> "the purpose of the statute appears to be to regulate the price of wheat for the benefit of the grower, and the federal power relied upon is the Commerce Clause. The bill was not handled in either chamber as a tax, and the revenue raised is for the achievement of a regulatory purpose and not to contribute to the general funds of the Treasury."

*Id.*, at 529 n. 3. Here, too, the deductions have a regulatory purpose—decreasing the oversupply of milk—and the proceeds of the deductions are not contributed to the Treasury but are used simply to offset some of the CCC's costs.

Moreover, we find unconvincing plaintiffs' argument that, because they do not sell milk products to the CCC, they receive no greater benefit from the price support program than does the general public. To the contrary, it is rational to assume that the CCC's purchases absorb excess supply which would otherwise result in lower market prices for milk and milk products, and that all dairy farmers are benefited to some extent by this system. If Congress had chosen to discourage milk production by lowering the milk price support level itself, or even eliminating it entirely, plaintiffs certainly could not seriously argue that the reduction or elimination constituted an illegal tax on dairy farmers. The deductions authorized by 7 U.S.C. § 1446(d)(2) appear to represent simply an indirect attempt to achieve the same result. In these circumstances the deductions do not constitute a tax and accordingly there was no unconstitutional delegation of the taxing power.

■ Plaintiffs' second constitutional argument is that the deductions are "penal" and "confiscatory," and constitute a taking in violation of the 5th Amendment, because they are levied against farmers who do not sell milk to the CCC and therefore do not benefit from the milk price support program.[9] The argument is without merit. As we have just noted, Congress is entitled to make the assumption that the milk price support program benefits all dairy farmers, regardless of whether they sell to the CCC. Congress' attempt to decrease milk production and to require producers to offset some of the costs of the price support program is a rational response to the problem of overproduction and is not invalid under the 5th Amendment.

■ In concluding that plaintiffs have not demonstrated a likelihood of success on the merits of their claim,[10] and that summa-

---

9. Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction at 136.

10. The "probability of success on the merits" standard, rather than the "fair ground for litigation" standard, governs the granting of prelimi-

**1530**

ry judgment dismissing the constitutional claims is appropriate, we do not discount plaintiffs' assertions of the harm that the deductions are causing to their dairy businesses. On purely equitable grounds, a deduction program targeted more selectively to take into account the financial viability of those affected might well be more desirable than the program authorized by Congress. Nonetheless, the Court is without authority to order the relief sought by plaintiffs unless legal deficiencies in the Secretary's actions are demonstrated. Such deficiencies have not been established here.

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. As to the constitutional claims, plaintiffs' motion for summary judgment is denied, the Secretary's cross-motion for summary judgment is granted, and the claims are dismissed. Decision on the Secretary's motion for summary judgment as to the administrative law issues is reserved.

It is so ordered.

nary relief "where the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond." *Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977). This would appear to be such a case.