William E. BROCK, Secretary of Labor

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Appellant.

No. 85–5969.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 27, 1986.

Decided July 18, 1986.

Carol A. Sigmond, with whom Sara E. Lister and Mark R. Pohl, Washington, D.C., were on brief, for appellant.

Joshua T. Gillelan, II, with whom Donald S. Shire, Associate Solicitor, Dept. of Labor, Washington, D.C., was on brief, for appellee.

Before ROBINSON, Chief Judge, GINSBURG, Circuit Judge, and EDWARD D. RE,* Chief Judge, United States Court of International Trade.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Under the District of Columbia's workers' compensation regime, all employers (or their compensation carriers) contribute to a Special Fund from which the Secretary of

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

Labor (Secretary) makes a variety of payments to injured workers. *See* 33 U.S.C. § 944. The Washington Metropolitan Area Transit Authority (WMATA), in 1983, stopped contributing to the Fund. WMATA asserted that its tax exempt status immunized it from the obligation to make Fund payments. The Secretary sued WMATA to collect arrearages; on cross-motions for summary judgment, the district court held for the Secretary. We affirm.

WMATA initially resisted the Secretary's suit on the ground that the Special Fund obligation is a tax against which WMATA is insulated by the compact that created it. *See* WMATA Compact § 78, Pub.L. No. 89-774, 80 Stat. 1324, 1350 (1966), codified at D.C. Code § 1-2431(78). Before this court, WMATA adds the argument that the constitutional doctrine of intergovernmental tax immunity (here, state immunity from federal taxation) shelters it from liability for Special Fund contributions.

We hold that WMATA enjoys neither constitutional nor compact immunity from the obligation to make payments to the Fund. As to the intergovernmental tax immunity doctrine, under *Massachusetts v. United States,* 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978), the obligation is properly characterized as a user fee, not a proscribed tax. Under the WMATA Compact as well, the Fund contribution obligation does not qualify as a tax from which WMATA is spared; instead, the obligation is most appropriately regarded as a fee attendant to regulation. *Cf. South Carolina v. Block,* 717 F.2d 874 (4th Cir.1983).

## I. BACKGROUND

The District of Columbia Workmen's Compensation Act of 1928 (DCWCA or the Act), Pub.L. No. 70-419, 45 Stat. 600, formerly codified at D.C. Code §§ 36-501-502 (1973), extended the workers' compensation protection of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, to employees in the District of Columbia until 1982, when the DCWCA was superseded by new legislation, D.C.Code § 36-301 *et seq.* (1979 & Supp.1984).[1] WMATA acknowledges its direct liability to employees for work-related injuries under the DCWCA, *see* Brief for Appellant at 7, and we have found WMATA liable for such injuries in the past. *See, e.g., Durrah v. WMATA,* 760 F.2d 322 (D.C.Cir.1985).

While WMATA recognizes the DCWCA's governance of compensation claims filed by its employees, WMATA disclaims liability for contributions to the DCWCA Special Fund, a resource created in its present form in 1972, *see* Pub.L. No. 92-576, 86 Stat. 1251, codified at 33 U.S.C. § 944. Administered by the Department of Labor, the Fund is kept separate from all other government funds. It is drawn upon for several kinds of workers' compensation payments. Currently, about ninety percent of the Fund's expenditures are "second injury" payments under Section 8(f) of the LHWCA, 33 U.S.C. § 908(f). That section provides that when a worker who is already partially disabled suffers a second injury that permanently disables him, and the extent of that permanent disability is greater than it would have been but for the preexisting disability, the Special Fund, in lieu of the employer (or its compensation carrier), will pay a portion of the disability compensation.[2] The arrangement is intended to enhance employment prospects for the handicapped by alleviating employer fears that workers' existing disabilities will

---

1. The new legislation governs liability for employment-related injuries suffered after July 26, 1982, but employers continue to be liable under the DCWCA for injuries suffered before that date.

2. As for payments in other categories, about 8% of the Fund's expenditures are "adjustments" under LHWCA § 10(h), 33 U.S.C. § 910(h). That section provides for the upward adjustment of compensation rates for employees injured before 1972, because prior to that date the law set a low ceiling on compensation payments and provided for no cost of living increases. The remaining 2% of the Fund's expenditures are made under a variety of provisions of the LHWCA, §§ 7(e), 8(g) & 18(b), 33 U.S.C. §§ 907(e), 908(g) & 918(b).

lead to inordinate compensation liabilities in the event of a later accident.

The amount each employer must contribute to the Fund is determined by a formula set out in 20 C.F.R. § 702.146. The formula first calculates the ratio of two amounts: 1) the direct DCWCA payments made during the previous year by *each* self-insured employer or insurer for an employer subject to DCWCA; and 2) the total direct DCWCA payments made by *all* employers and insurers during the same period. The contribution of each self-insured employer or insurer to the Special Fund is then set as the same fraction of the total estimated Fund liabilities for the upcoming year. Each employer thus bears the same share of the Special Fund liabilities as that employer's share of the total direct compensation liabilities.

From 1974 until 1982, WMATA was a self-insured employer and made its contributions to the Special Fund without protest.[3] Throughout that same period, WMATA now claims, its contributions to the Fund were considerably greater than the benefit it received from the Fund, *i.e.*, the Fund's payouts to WMATA employees. WMATA refused to pay the second half of its 1983 contribution and all of its 1984 contribution. The Secretary of Labor therefore commenced this action to collect the unpaid assessments. WMATA counterclaimed for a refund of all its past Special Fund contributions, urging that the payments it once made without protest were taxes from which WMATA is totally exempt under its Compact.

The district court ruled that WMATA is not exempt from the Special Fund assessments. First, the court held that the assessments fall outside the Compact's exemption because they are "used to supply a specific fund with a specific purpose—in this case providing supplemental benefits in second injury cases," and "do not in a general sense finance the public expense." *Donovan v. WMATA*, 614 F.Supp. 1419, 1421 (D.D.C.1985) (WMATA). The court also observed that WMATA's tax exemption is limited to taxes on property, activities, and revenue, and held that the Special Fund assessments, even if they could be typed "taxation," would not qualify as taxes on property, activities, or revenue. *See id.* at 1421–23.[4] WMATA now appeals this determination.

## II. Discussion

WMATA advances two related contentions. First, it offers an argument that it did not present to the district court: WMATA is spared from the obligation to contribute to the Special Fund by the constitutional doctrine of intergovernmental tax immunity. In support of this contention, WMATA cites *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978), which assumes, without deciding the point, that the state-federal tax immunity doctrine retains "present vitality," *id.* at 454, 98 S.Ct. at 1160, and then holds that "taxes that operate as user fees," *id.* at 463, 98 S.Ct. at 1165, are not proscribed by the doctrine. Second, WMATA maintains that it is immune from the Special Fund obligation under Section 78 of the WMATA Compact. Here again, WMATA cites the *Massachusetts* precedent, which it reads as defining a proscribed tax in the manner intended by the Compact provision.[5]

---

**3.** The Secretary observes that WMATA's current protest coincides with the termination of the statutory requirement that it obtain authorization to act as a self-insurer. *See* Brief for Plaintiff-Appellee at 8–9. The district court, although acknowledging WMATA's position that "its refusal to pay the assessment is based upon re-evaluation of the propriety of compliance," found "striking the coincidence in time between WMATA's refusal to pay and the termination of its obligation to pay as [a condition of remaining] a self insurer." *Donovan v. WMATA*, 614

F.Supp. 1419, 1420–21 n. 3 (D.D.C.1985) (*WMATA* ).

**4.** The district court correctly observed that, while the Compact exemption refers to "taxes or assessments," the latter word "signif[ies] only a localized liability," and does not expand the scope of the exemption. *See WMATA*, 614 F.Supp. at 1422 n. 7.

**5.** The parties also repeat arguments of a rather abstract quality, earlier aired in the district court, about whether the Special Fund obli-

We hold that the Special Fund obligation qualifies as a user fee, not a proscribed tax, under the *Massachusetts* definition; therefore, both of WMATA's arguments fail. We further hold, however, that the analysis most appropriate for determining whether the Fund payment obligation constitutes a tax exempt under WMATA Compact § 78 is the one employed in *South Carolina v. Block*, 717 F.2d 874 (4th Cir. 1983). Under that delineation, the Special Fund obligation is properly regarded not as a tax from which the Compact exempts WMATA, but as a fee attendant to regulation.

### A. *Constitutional Immunity*

In the hoary case of *Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1871), the Supreme Court declared that states and state instrumentalities are constitutionally immune from federal taxes on certain state functions because otherwise, by invoking its awesome taxing power, the federal government would be positioned to destroy state sovereignty. *Collector v. Day* held salaries paid to state judges immune from federal tax and that holding itself has been overruled. *See Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927 (1939). Moreover, the reach of the constitutional immunity doctrine has been so restricted that its "present vitality" is open to question. *See Massachusetts*, 435 U.S. at 454, 98 S.Ct. at 1160.[6] Assuming arguendo that the doctrine survives, albeit shrunken in size, the scope of the immunity plainly has been restricted both with respect to the activities sheltered and the kinds of financial obligations covered. The Supreme Court has instructed, most recently, that no immunity attaches to an obligation properly typed as a user fee. *See Massachusetts, supra.* Such obligations, the Court has indicated, do not threaten state sovereignty, regardless of the nature of the state activities on which they are laid.

We turn now to an explanation of our holding that the Special Fund assessment

---

gation, if a tax, is a tax "on" property, operations, or revenue. *See* Brief for Appellant at 28–43; Brief For Plaintiff-Appellee at 30–46. Because we hold that the obligation qualifies as a user fee, and therefore may be imposed on WMATA without affront to the Constitution or the Compact, we need not and do not pursue metaphysical inquiries on what is a tax, and when is a tax "on" something. *See infra* at 8–13, 17–18.

**6.** Before *New York v. United States*, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), the Court held that the federal government may tax "proprietary" state functions but not "essential governmental" functions. Although this distinction proved difficult to apply, the Court did hold that the operation of a street railway was a proprietary function, *see Helvering v. Powers*, 293 U.S. 214, 227, 55 S.Ct. 171, 174, 79 L.Ed. 291 (1934), and this holding has never been overruled. By simple application of precedent, then, we conclude that WMATA's operation of a public transit system is a proprietary function, and so even if a tax, the Special Fund obligation as applied to WMATA does not violate the doctrine of intergovernmental tax immunity.

As our text statement indicates, we are uncertain whether the doctrine of state immunity from federal taxation retains any substantive content at all. In *New York v. United States*, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), Justice Frankfurter delivered the judgment for the court in an opinion in which Justice Rutledge joined; surveying the confusion wrought by attempts to create a substantive standard, he concluded that the states' only constitutional protection against nondiscriminatory taxes was structural: their representation in Congress. *See id.* at 580–84, 66 S.Ct. at 313–15. (Four other justices agreed that the "governmental/proprietary" distinction was unworkable but preferred to retain a "practical construction" of the doctrine of intergovernmental tax immunity, developed on a case-by-case basis. *Id.* at 586–89, 66 S.Ct. at 316–18.)

More recently, in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court held that the closely analogous doctrine of state immunity to federal regulation has no substantive content. Citing and following the structure of Justice Frankfurter's opinion in *New York*, the Court surveyed the confusion wrought by its attempt to create a substantive standard and concluded that the states' constitutional protection against federal regulation is not substantive but structural through their representation in Congress. *See id.* at 1012–14.

Given the state of High Court precedent, we think it fair to say, as the plurality did in *Massachusetts v. United States*, 435 U.S. 444, 454, 98 S.Ct. 1153, 1160, 55 L.Ed.2d 403 (1978), that the "present vitality of the doctrine of state tax immunity" is unsettled.

is not a tax of the kind that a still vital intergovernmental tax immunity doctrine would encompass. In that frame of reference, the assessment qualifies as a user fee. In *Massachusetts,* the Supreme Court set out three features which, for tax immunity purposes, distinguish permissible user fees from proscribed taxes. The parties apparently agree that the Special Fund bears the first two features of a user fee. First, user fees do not discriminate against state functions. *See* 435 U.S. at 466, 98 S.Ct. at 1166. The Fund obligation does not so discriminate, for it is applicable to private and public employers alike. Second, user fees "are structured to produce revenues that will not exceed the total cost to the Federal Government of the benefits to be supplied." *Id.* at 466–67, 98 S.Ct. at 1167. The Special Fund is so structured; it is a separate fund within the United States Treasury and statutorily not "the money or property of the United States." LHWCA § 44(a), 33 U.S.C. § 944(a).

The parties centrally disagree on whether the Special Fund obligation bears the third characteristic of user fees: such fees recover only a "fair approximation of each beneficiary's share of the cost." 435 U.S. at 460, 98 S.Ct. at 1164; *see id.* at 465–66, 98 S.Ct. at 1166. WMATA, now seeking to avoid contributions entirely, argues that it has historically paid into the Fund more than its fair share of the Fund's costs; its assessments, WMATA contends, have been significantly higher than the Fund's payouts to WMATA employees. *See* Brief for Appellant at 22–23. We have some doubt about the accuracy of this proposition as a factual matter.[7] Even if correct, however, the allegation of *historical* disproportionality of costs and benefits is hardly dispositive of the question at issue. *Massachusetts* did not hold that a user fee must represent retrospectively a close approximation of the actual, historical benefit to the user. Rather, *Massachusetts* held only that the method used to calculate the fee must rationally be designed to approximate prospectively the benefit to the user.

The levy held constitutional in *Massachusetts* illustrates this meaning of "fair approximation." The fee was a flat registration tax for all civil aircraft, introduced to help finance federal aviation programs; the amount of the fee was based on the size and type of aircraft, but not the aircraft's actual use of the airways or the facilities and services supplied by the United States. Massachusetts sought exemption for aircraft it owned and used exclusively for

7. WMATA bases its claim on an affidavit prepared by the Special Assistant to WMATA's Risk Manager. *See* Affidavit of Richard A. Barnes (Nov. 16, 1984), Joint Appendix (J.A.) at 119–31. That affidavit states that WMATA calculated the Fund payout to WMATA employees in the following manner: WMATA learned from the Department of Labor how much money the Special Fund had paid to WMATA employees during the period January-May 1984 ($79,410.74); WMATA then annualized that amount to estimate the total payout for 1984 (about $190,000); WMATA next subtracted 4.5% from that amount as an allowance for inflation for each preceding year to calculate the payout to WMATA employees in those earlier years. WMATA then graphed these payout figures against the WMATA assessments, which were obtained from historical records. *See* J.A. at 124.

Two features of this graph undercut WMATA's claim that its burdens have consistently exceeded its benefits. First, although after 1979 the assessment line is higher than the payout line, in 1978 the two lines intersect, showing that WMATA's assessment equalled its employee payout benefits from the Fund. Second, except for the period January-May 1984, all of the payout figures are estimated on the assumption that the payout level remained constant except for inflation. This assumption, implausible on its face, has now been shown to be unwarranted. Based on the data for January-May 1984, WMATA calculated a payout of about $190,000 for 1984; the Secretary now informs us that the Special Fund actually paid out about $446,000 to WMATA employees during 1984. *See* Brief for Plaintiff-Appellee at 10. This amount is still less than WMATA's $1.1 million assessment for the same period, but even by WMATA's calculation method, if WMATA had based its computations on a figure of $446,000 in 1984, the payout line would have intersected the assessment line closer to 1980 than 1978 and would have been higher than the assessment line before that. More basically still, we simply have no way of knowing with any certainty the actual payout figures for the years before 1984. While it is true that assessment exceeded payout in 1984, payout may have exceeded assessment in the earlier years, and on average over the whole period the payout may have equalled or exceeded the assessment.

police functions. The Court rejected the state's plea.

The *Massachusetts* opinion acknowledged that a fee based on actual use would measure the benefit to the user more accurately. The Court emphasized, however, that an actual use measurement method would be more costly to administer. Furthermore, the Court observed, the measurement method employed does bear a fair relationship to the benefit: bigger planes are more expensive for the federal safety system to accommodate. Finally, the Court noted that all users receive certain ambient or indirect benefits from the federal aviation system: the federal services are available to, and make the airspace safer for, all users. *See* 435 U.S. at 468–69, 451 n. 9, 98 S.Ct. at 1167–68, 1159 n. 9.

Judged by the *Massachusetts* example, the Special Fund assessment fairly approximates the Fund's benefit to WMATA. An assessment based on the amount of the Fund's past payout to WMATA employees, rather than on WMATA's direct DCWCA liabilities, might be a more accurate measure of the benefit WMATA enjoys from the Fund.[8] Such a method of assessment, however, would also be more burdensome to administer because it would require the Secretary to calculate and record separately total Fund payouts to the employees of each employer.[9] The present method of calculation, moreover, does bear a fair relation to the benefit. The assessment is based on the employers' direct workers' compensation liabilities; employers who make more direct payments most probably have more employees who make "second injury" claims on the Special Fund, for such employers are likely to have more employees, more handicapped employees, less safe working conditions, or some combination of these three characteristics.

Finally, like the *Massachusetts* registration tax, the Fund provides certain ambient or indirect benefits to each employer over and above actual payouts to the employer's workers. First, the workers' compensation liability system in general, and the Special Fund in particular, furnish all District of Columbia employers with a substitute for the tort system of employer liability, *see* LHWCA § 5(a), 33 U.S.C. § 905(a); WMATA may take advantage of the "second injury" fund whenever one of its employees with a pre-existing disability becomes permanently disabled. In addition, the existence of the Special Fund, as one component of complete workers' compensation protection, arguably benefits employers by making employees more secure and therefore more productive. Furthermore, the Fund may reduce WMATA's direct compensation liability: because of the availability of the "second injury" payments, other employers may be induced to hire partially disabled workers to whom WMATA has been paying compensation. To the extent that these workers will thus have enhanced employment opportunities, WMATA's compensation payments will be reduced.

 WMATA insists that even allowing for these ambient benefits, its contributions to the Fund historically have exceeded the benefits WMATA and its employees have received from the Fund. *But cf. supra* note 7. The argument does not carry the weight WMATA ascribes to it. The possibility that a state instrumentality may be somewhat overcharged for the benefits it receives from a federal program poses no

---

8. WMATA correctly observes that it can never benefit from two components of the Fund's expenditure. First, 8% of the Fund's payouts are adjustment payments for workers disabled before 1972, *see supra* note 2, but WMATA did not become subject to the DCWCA until 1973. Second, under LHWCA § 18(b), 33 U.S.C. § 918(b), somewhat less than 2% of the Fund's payments are made to workers who are owed compensation by insolvent employers or insurers, but WMATA, by the terms of its charter, will never become insolvent. *See Morris v. WMATA*, 781 F.2d 218 (D.C.Cir.1986).

9. At present, the Secretary does apparently record the raw data necessary to make these calculations; indeed, it is from these data that he calculated the payout to WMATA employees for this case. However, the Secretary apparently does not perform such calculations as part of his normal recordkeeping; the calculations in this case were made in response to an interrogatory by WMATA. *See* Affidavit of Richard A. Barnes at ¶ 3, J.A. at 120.

threat of undue federal encroachment upon a state's domain as long as the charge imposed is nondiscriminatory and represents a "fair approximation" of the benefits received. *See Massachusetts,* 435 U.S. at 466, 98 S.Ct. at 1167. Because we find that the payments in question entail a fair approximation of projected benefits, and, moreover, relate to a "proprietary" function, *see supra* note 6, we conclude that WMATA cannot tenably claim constitutional immunity from the Special Fund assessment.

### B. *Compact Immunity*

WMATA was created in 1966 by a compact between the District of Columbia, Virginia, and Maryland, with the consent of Congress. *See* Pub.L. 89–774, 89th Cong., 2d Sess., 80 Stat. 1324 (1966), codified at D.C. Code § 1–2431. Section 78 of the Compact provides for WMATA's tax immunity:

> [The] carrying out of the corporate purposes of the Authority is in all respects for the benefit of the people of the signatory states and is for a public purpose.... Accordingly, the Authority and the Board shall not be required to pay taxes or assessments upon any of the property acquired by it ... or upon its activities in the operation and maintenance of any transit facilities, or upon any revenue therefrom.

D.C. Code § 1–2431(78).

WMATA maintains that the "taxes or assessments" from which WMATA is exempt under Section 78 are those that constitute "taxes," not "user fees," under the analysis in the *Massachusetts* case. *See* Brief for Appellant at 22. As we have just explained, however, *see supra at* 8–13, under the *Massachusetts* analysis, the obligation to contribute to the Special Fund qualifies as a permissible user fee, not a proscribed tax.[10]

More fundamentally, we question whether the *Massachusetts* case offers the best frame of reference for the issue at hand, *i.e.,* is the obligation to contribute to the Special Fund a "tax" for purposes of the exemption stated in Section 78. Indeed, the *Massachusetts* opinion essays no definition of the term "tax." Rather, it defines "user fee" and states why such a fee is not a tax within the compass of the state immunity from federal taxation doctrine. *Massachusetts* surely does not say that federal financial exactions other than user fees are correctly typed "taxes" for all or any purposes. Rather, the Court's decision simply explains why states cannot claim tax immunity for a levy with the three characteristics set out in the *Massachusetts* opinion: a levy of the user fee kind "could never seriously threaten" state sovereignty. *See* 435 U.S. at 460, 98 S.Ct. at 1163. The preservation of essential state operations, however, was not the concern that motivated the tax exoneration provision in the WMATA Compact.

The language of Section 78 itself plainly indicates that provision's rationale. The section states:

> As we explain in text, the tax exemption contained in § 78 of the Compact indicates concerns different from those reflected in § 64(a)(4) of the Bankruptcy Act. Here, and throughout its presentation, WMATA misses the point that the characterization of a payment as a "tax" in certain contexts has no "talismanic significance." *Massachusetts,* 435 U.S. at 460 n. 18, 98 S.Ct. at 1164 n. 18. As stated by a redoubtable legal scholar: "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." Cook, *"Substance" and "Procedure" in the Conflict of Laws,* 42 Yale L.J. 333, 337 (1933).

**10.** WMATA also cites In re Pan American Paper Mills, 618 F.2d 159 (1st Cir.1980) (*Pan Am* ), as a case closely in point which defines as a "tax" a nonconsensual exaction for a public purpose. *Id.* at 162. *Pan Am* concerned a statute which required employers to pay premiums to a workers' compensation insurance fund; Pan Am, an employer, filed for bankruptcy, and the government sought to have the premium arrearages accorded priority under § 64(a)(4) of the Bankruptcy Act, then codified at 11 U.S.C. § 104(a)(4) (1976), which accorded priority to taxes. The *Pan Am* court's encompassing statement was framed to fit bankruptcy policies and the Supreme Court's "broad view of what constitutes 'taxes' within the meaning of § *64(a)(4)."* 618 F.2d at 162 (emphasis added).

It is hereby declared that the creation of the Authority is in all respects for the benefit of the people of the signatory states and is for a public purpose.... Accordingly, the Authority and the Board shall not be required to pay taxes or assessments....

Since WMATA, in other words, serves an exclusively public purpose, no end would be achieved by making WMATA contribute to the public fisc money that will then be diverted to some other public good, like the police or fire departments. Rather, the path of efficiency is to allow WMATA to keep its money and pay for other public goods out of other revenues. A public good like WMATA cannot contribute to the commonweal out of private monies because it has none; its activity as a transit service is its contribution.

This rationale suggests that a levy is properly defined as a "tax" within the meaning of the WMATA Compact provision when its principal purpose is to raise revenue, not to regulate activities. The construction we thus pose is the familiar one used by courts in determining when Congress has exercised its taxing power, so that the challenged legislative action must satisfy the requirements of Article I, Sections 7 and 8 of the Constitution. The Supreme Court, over a century ago, explained the demarcation in *Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). That controversy concerned a fifty-cent head duty imposed on ship owners for each immigrant passenger carried to United States ports; the levy was paid into a separate fund used to finance the administration of the federal immigration statutes. The Court held that the head money charge involved an exercise of Congress' commerce power, not its taxing power, because "[t]he burden imposed on the ship owner by this statute is the mere incident of the regulation of commerce—of that branch of foreign commerce which is involved in immigration. The title of the act, 'An Act to regulate immigration[]' [describes] the real purpose and effect of the statute.... The money thus raised, though paid into the Treasury, is appropri-

ated in advance to the uses of the statute, and does not go to the general support of the government." *Id.* at 595–96.

Lower courts have employed similar reasoning in cases involving financial exactions from farmers under farm produce price support statutes. *See South Carolina v. Block*, 717 F.2d 874 (4th Cir.1983) (deduction from sale of all commercially marketed milk, used to offset cost of milk support price program, is not exercise of taxing power); *United States v. Stangland*, 242 F.2d 843 (7th Cir.1957) (financial penalty for growing crops in excess of statutory quotas is not an exercise of taxing power); *Rogers v. United States*, 138 F.2d 992 (6th Cir.1943) (same); *Mandel v. Block*, 573 F.Supp. 1522 (S.D.N.Y.1983) (same holding as *South Carolina v. Block*); *Mulroy v. Block*, 569 F.Supp. 256 (N.D.N.Y.1983) (same), *aff'd*, 736 F.2d 56 (2d Cir. 1984) (per curiam). As the Fourth Circuit recently and succinctly expressed the distinction: "The mere fact a statute raises revenues does not imprint upon it the characteristics of a law by which the taxing power is exercised.... The imposition of assessments have [sic] long been held to be a legitimate means of regulating commerce.... If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax." *South Carolina v. Block*, 717 F.2d at 887 (citations omitted).

Under this construction, the Special Fund assessment is a fee rather than a tax because the "primary purpose" of the DCWCA is regulation, not the raising of revenue. The entire workers' compensation scheme, of which the Special Fund is an integral part, regulates employers' liabilities for industrial accidents. The scheme also indirectly regulates employers' conduct by holding them accountable for accidents and exacting increased contributions to the Special Fund when their proportion of direct compensation liabilities increases. Thus, the DCWCA replaces tort law as the body of regulative law for this field, and fees associated with the statute

are better compared with tort awards than with revenue-raising taxes.[11] Finally, like the levies at issue in the *Head Money Cases* and *South Carolina v. Block, supra,* the Special Fund assessments are "appropriated in advance to the uses of the statute, and do [ ] not go to the general support of the government." 112 U.S. at 596, 5 S.Ct. at 252.

In sum, the "primary purpose" of the DCWCA is to regulate liability for industrial accidents. This regulation may include the assessment of fees; but such fees are inextricably bound up with the regulatory scheme, they are not designed to raise revenue for public goods. We therefore conclude that the Special Fund assessment is not a tax as that term is employed in Section 78 of WMATA's Compact, but a fee attendant to regulation. Accordingly, we hold that WMATA is liable for the amount claimed.[12]

### CONCLUSION

The definition of "tax" in the abstract is a metaphysical exercise in which courts do not have occasion to engage. The term comes before judges embedded in legal contexts from which the word gains concrete and specific meaning. In neither of the contexts here relevant—the doctrine of intergovernmental tax immunity and Section 78 of WMATA's Compact—is the Special Fund a tax from which WMATA is immune.

Under the constitutional doctrine of state immunity from federal taxation, the Special Fund obligation qualifies as a permissible user fee, not a proscribed tax, because it does not discriminate against state functions, is structured to produce revenues that will not exceed costs, and is assessed according to a formula by which the Secretary will collect from each employer a "fair approximation" of the employer's share of

the cost. *See Massachusetts,* 435 U.S. at 465–66, 98 S.Ct. at 1166–67. Under Section 78 of WMATA's Compact, the Special Fund obligation is not a tax from which WMATA is shielded, because the primary purpose of the general statute that created the Fund—the DCWCA—is the regulation of liability for industrial accidents, not the raising of revenue. We therefore hold that WMATA is liable for the assessments the Secretary seeks to collect, and that WMATA is not entitled to refund of past Special Fund assessments. The judgment of the district court is

*Affirmed.*

---

**11.** The district court suggested this point when it noted that the assessments are "less a legislative exactment than a part of the statutory dynamic between tort immunity for employers' [sic] and workmen's compensation." *WMATA,* 614 F.Supp. at 1421 n. 6.

**12.** Because we uphold the district court's judgment that WMATA is not immune from the Special Fund assessment, we also uphold that court's rejection of WMATA's counterclaim for a refund of past contributions to the Special Fund.