**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

No. 85 Civ. 9680 (WCC).

United States District Court,
S.D. New York.

Sept. 29, 1988.

As Amended. Oct. 4, 1988.

Stroock & Stroock & Lavan, New York City (James G. Greilsheimer, Janis Ettinger, William A. Rome, of counsel), Law Department, National R.R. Passenger Corp., Washington, D.C. (Stephen C. Rogers, Peter S. Craig, Dennis M. Moore, of counsel), for plaintiff.

Peter L. Zimroth, Corp. Counsel of the City of New York, New York City (Joseph T. Lauer, Robert Pfeffer, Carole S. Slater, Anthony Semancik, Assts. Corp. Counsel, of Counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Pursuant to 45 U.S.C. § 546b, Amtrak has been immune since October 1, 1981 from paying "any taxes or other fees" to state and local governments. The question presented in this action is whether this statute bars New York City from continuing to collect payments from Amtrak to which the City would otherwise be entitled pursuant to franchise agreements entered into between the City and Amtrak's predecessors in 1902 and 1907. The parties have cross-moved for summary judgment. For the reasons set forth below, judgment is granted in favor of the City.

### Background

The material facts are not in dispute. Plaintiff National Railroad Passenger Corporation ("Amtrak") was established by Congress under the Rail Passenger Service Act, 45 U.S.C. § 501 *et seq.*, to provide intercity and commuter rail passenger service. To provide that service, Amtrak uses streets, waterways, and public lands owned by the City of New York (the "City") for rail tracks, underground tunnels and a railroad bridge.

Amtrak is the successor-in-interest to two separate contracts, one between the City and the Pennsylvania, New York and Long Island Railroad Company, dated 1902, and the other between the City and the New York Connecting Railroad, dated 1907. Pursuant to these contracts, the City authorizes the railroad to use and occupy the City's property in exchange for "rental" payments. These payments are "readjusted" every twenty-five years. The City of New York is the only municipality that requires that the railroad make such payments for the use of city streets, waterways, and public lands.

The sums required by the City were paid by the railroad until the enactment of section 546b, which provides in pertinent part:

[N]otwithstanding any other provision of law, [Amtrak] shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority which are levied on [Amtrak], or any railroad subsidiary thereof, from and after October 1, 1981. . . .

In 1982, Congress enacted legislation authorizing the expenditure of thirty million dollars in federal funds for a rehabilitation project designed to improve rail passenger service along the west side of Manhattan and, when complete, to provide direct rail service between Amtrak's Northeast Corridor line and its route to upstate New York. The City then demanded payment of arrearages due under the 1902 and 1907 franchises as a condition to granting its consent to the construction of a tunnel necessary to the project. That led Amtrak to institute this lawsuit.

### Discussion

Section 546b exempts Amtrak from paying "any taxes or other fees" to state and local governments. The City contends that Congress did not intend to exempt Amtrak from paying it rent for the rights of way. Alternatively, it submits that such an exemption would be invalid. Since I agree that section 546b does not exempt Amtrak from the rental payments, I need not reach the City's arguments concerning the validity of such an exemption.

I must decide whether the payments demanded by the City constitute "taxes or

other fees" within the meaning of section 546b. The plain language of the statute does not aid this inquiry. The phrase "taxes or other fees" does not expressly include or exclude rental payments for the use of municipal streets, waterways, and public lands. It is therefore necessary to examine the legislation's purpose and history. *See Berger v. Heckler*, 771 F.2d 1556, 1571 (2d Cir.1985) ("[W]here the scope of a statutory provision is not made crystal clear by the language of the provision, it is appropriate to turn to the legislative history of the statute.").

*Legislative History*

Section 546b was enacted in response to the findings set forth in a statutorily commissioned report by the United States Department of Transportation ("DOT") and was intended to relieve the increasing burdens imposed on the federal treasury as a result of Amtrak's continuing and projected operating deficit. In particular, DOT perceived a need to halt the conversion of federal dollars, intended for the operation of a national rail passenger system, into local revenues collected by cities along the Northeast Corridor, including New York. It was estimated that these local revenues would have reached fourteen million dollars in 1982.[1] H.Rep. No. 81, 97th Cong., 1st Sess. 19 (1981) [hereinafter House Report]. DOT concluded, in a portion of its report quoted with approval by the House of Representatives:

> Had Amtrak been profitable as well as initially expected, it would have met its tax obligations with private funds, just as other private corporations do. Instead, it now meets its tax obligations with public funds. The irony of paying taxes with taxes has the effect of diverting Amtrak's attention and funds from the purpose Congress intended. This irony is compounded by the fact that any addition to or improvement in Amtrak services is primarily funded by Federal dollars and usually increases Amtrak's tax bill.

DOT Report (September 1980), *quoted in,* House Report at 20.

While reducing the federal deficit was the primary motivation behind the enactment of section 546b, Congress was very explicit as to how its goal was to be achieved. Amtrak, though probably not an instrumentality of the federal government for tax immunity purposes, *see National Railroad Passenger Corp. v. Atcheson, Topeka and Santa Fe Railway Company*, 470 U.S. 451, 467, 105 S.Ct. 1441, 1452, 84 L.Ed.2d 432, (1985) (Amtrak is a nongovernmental corporation); *Sentner v. Amtrak*, 540 F.Supp. 557, 561 (D.N.J.1982) (Amtrak is not a federal instrumentality for punitive damage purposes), was to be made statutorily immune from state taxation.

Congress authorized DOT to address Amtrak's "payment of taxes ... including the payment of property taxes, sales taxes, gross revenue taxes, fuel taxes, licenses, and other user fees." *See* Amtrak Reorganization Act of 1979, Pub.L. No. 96–73, § 125. DOT recommended that Congress accord Amtrak the same protection from state taxation that the federal government itself receives. In its report, DOT explained:

> There is sufficient legal precedent to support Congress' granting of tax exemptions to Amtrak. The ability of Congress to legislate the immunity of Congressionally established (Government) corporations from state taxation is rooted in Article 1, Section 8, Clause 18, the "Necessary and Proper Clause" and Article VI, Clause 2, the "Supremacy Clause" of the Constitution. The Supreme Court, in numerous decisions, has consistently upheld the right of Congress to immunize Government corporations from state taxation.

DOT Report (September 1980), *quoted in,* House Report at 21.

DOT's recommendation was adopted by the House Committee. The Committee's bill exempted Amtrak from:

---

1. Unfortunately, the record does not indicate whether the DOT in arriving at this fourteen million dollar figure included the rental payments demanded by the City.

[T]he payment of all state and local taxes, "including but not limited to property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, *to the same extent as the United States is exempt from the payment of such taxes or other fees.*"

House Report at 21 (emphasis supplied). Moreover, the Committee indicated that Amtrak would not be exempt from paying "fees for services used, such as water and sewer, *just as the United States is not exempt from the payment of such fees.*" *Id.* (emphasis supplied).

While the Senate Committee bill used different language, it is evident that both houses wanted to extend to Amtrak the same immunity from state taxation that the United States enjoys. The Senate proposed a "permanent exemption from State and local taxes." S.Rep. No. 516, 97th Cong., 2d Sess. 170 (1982). The Joint Committee indicated that the House and Senate bill were merely in "technical disagreement" and adopted the Senate bill's language. H.Rep. 747, 97th Cong., 2d Sess. 42 (1982).

The legislative history of section 546b makes it plain that Congress intended to reduce Amtrak's operating deficit by providing it with the federal government's immunity from state and local taxation. *See also National Railroad Passenger Corporation v. Commonwealth of Pennsylvania Public Utility Commission,* 848 F.2d 436 at 440 (court construed section 546b "in a manner consistent with federal immunity from local taxes."). This case, therefore, must be resolved by reference to the case law governing federal tax immunity.

### Tax Immunity

Under the doctrine of sovereign tax immunity, federal and state governments are immune from taxation by each other. This rule, established by the Supreme Court in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), rests on "an implied limitation on the taxing power of each, such as to forestall undue interference with the governmental activities of the other." *Graves v. New York ex rel.*

*O'Keefe,* 306 U.S. 466, 477–78, 59 S.Ct. 595, 596–97, 83 L.Ed. 927 (1938).

This immunity extends beyond the protection of the governments themselves; federal and state instrumentalities are also immune from taxation. An entity is a "federal instrumentality" for tax immunity purposes only if it is "so assimilated by the Government as to become one of its constituent parts." *United States v. Township of Muskegon,* 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958).

Where Congress is silent, the federal government and its instrumentalities are absolutely immune from direct state taxation. *See Mayo v. United States,* 319 U.S. 441, 448, 63 S.Ct. 1137, 1141, 87 L.Ed. 1504 (1943); *Shapiro v. Baker,* 646 F.Supp. 1127, 1131 (D.N.J.1986) (immunity is applicable only where the governmental entity itself is "legally" obligated to bear the costs of the tax). *But see* Note, *Federal Immunity from State Taxation: A Reassessment,* 45 U.Chi.L.R. 695, 730 (this "last vestige of absolute tax immunity" should be abandoned). The scope of this traditional immunity, however, may be altered by Congress. "Congress may curtail an immunity which might otherwise be implied by authorizing state taxation of federal instrumentalities.... Likewise, Congress ... may enlarge an immunity beyond the point where, Congress being silent, the Constitution would set its limits." *United States v. Leavenworth, Kansas,* 443 F.Supp. 274, 279 (D.Kan.1977).

Under the Supremacy Clause, Congress may also act, within its enumerated powers, to "exempt its agencies from state imposed taxes." *United States v. State of Mississippi,* 578 F.Supp. 348, 351 (S.D. Miss.1984); *see also United States v. Leavenworth, Kansas,* 443 F.Supp. 274, 279 (D.Kan.1977) (Congress may protect its agencies from the burdens of local taxation) (citing *Mayo v. United States,* 319 U.S. 441, 446, 63 S.Ct. 1137, 1140, 87 L.Ed. 1504 (1942)). "Congress has not only the power to create a corporation to facilitate the performance of governmental functions, but has the power to protect the operations validly authorized." *Pittman v.*

*Home Owners' Corp.*, 308 U.S. 21, 32–33, 60 S.Ct. 15, 17–18, 84 L.Ed. 11 (1939); *see also National R.R. Passenger Corp. v. New Castle County*, 633 F.Supp. 354, 360 (D.Del.1986) (Congress has the power to grant Amtrak immunity from state and local taxation).

The sovereign tax immunity rule "is more easily stated than applied." *Leavenworth, Kansas*, 443 F.Supp. at 278. Even the Supreme Court has noted that "the line between the taxable and the immune has been drawn by an unsteady hand." *United States v. Allegheny County*, 322 U.S. 174, 176, 64 S.Ct. 908, 910, 88 L.Ed. 1209 (1943), *overruled sub silentio on other grounds, United States v. City of Detroit*, 355 U.S. 466, 469, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1957).

It is well-settled, however, that in determining whether the state has imposed a "tax," courts will go "beyond the bare face of the taxing statute to consider all relevant circumstances." *United States v. City of Detroit*, 355 U.S. 466, 469, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1957). Indeed, the Supreme Court has long held that the scope of intergovernmental immunity is governed by federal law, because "[w]here a federal right is concerned we are not bound by the characterization given to a state tax by state courts or legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." *Allegheny County*, 322 U.S. at 184, 64 S.Ct. at 914 (quoting *Carpenter v. Shaw*, 280 U.S. 363, 367–68, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930)).

*Rent as a User Fee*

No federal case deals with the distinction between taxes and rent. Indeed, the Supreme Court has never defined "tax" for federal immunity purposes. Yet the Court has indicated, in analogous contexts, that "user fees," voluntary payments made to the government in exchange for particular benefits, are not taxes. For example, in *Massachusetts v. United States*, 435 U.S. 444, 462, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978), the Court held that a state's tax immunity did not shield it from paying the federal government a user fee. In upholding the user fee, the Court observed:

> A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost and, provided that the charge is structured to compensate the government for the benefit conferred, there can be no danger of the kind of interference with constitutionally valued activity that the Clauses were designed to prohibit.

*Id.* at 462–63, 98 S.Ct. at 1164–65. Under this analysis, the City is clearly entitled to obtain compensation for the opportunities that it forgoes in providing Amtrak with exclusive rights of way through its property.

Amtrak contends that the rental payments cannot be characterized as user fees. Plaintiff's Reply Memorandum of Law at 6–8. Yet rent is clearly voluntary payment in return for benefits conferred. Amtrak's contention that the railroad has never made the payments "voluntarily," Plaintiff's Memorandum of Law at 28, is based on a narrow definition of that term which has been rejected by the Supreme Court in other contexts. For example, in *National Cable Television Association v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Court distinguished "taxes" from "fees" as follows:

> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard the benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is *incident to a voluntary act*, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

415 U.S. at 340–41, 94 S.Ct. at 1148–49 (emphasis supplied). That case involved a fee required of all corporations interested in operating cable television franchises.

The court found that such payments were not taxes, in part, because the government's demand was incident to the cable station's voluntary request for a franchise. Using this analysis Amtrak's payments would be considered "voluntary." The City's demand for rent was obviously incident to the railroad's request for a right of way.

Another indication that the rental payments are user fees is that Amtrak is benefited by its use of the City's land. In construing a federal statute authorizing the imposition of user fees, the Court specifically rejected a narrow definition of the term "benefit." *Federal Power Commission v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). It found that public utilities received a "benefit" from the federal agency's regulation of them, 415 U.S. at 348–49, 94 S.Ct. at 1153–54, and rejected Justice Marshall's criticism that "the creation of an 'economic climate' which fosters the growth of a regulated industry is [not] a sufficiently specific, discrete benefit within the meaning of the Appropriation Act to justify imposition of a fee." 415 U.S. at 357, 94 S.Ct. at 1158 (Marshall, J., concurring). Amtrak could not seriously contend that it has received no benefit from its use of the City's streets and waterways.

■ In the state immunity area, the Supreme Court has adopted a test to determine whether a payment demanded by the federal government is a tax or user fee:

Whatever the present scope of the principle of state tax immunity, a State can have no constitutional objection to a revenue measure that satisfies the three-prong test.... So long as the charges do not discriminate against state functions, are based on a fair approximation of use of the system, and are structured to produce revenues that will not exceed the total cost to the Federal Government of the benefits to be supplied, there can be no substantial basis for a claim that the National Government will be using its taxing powers to control, unduly interfere with, or destroy a State's ability to perform essential services.

*Massachusetts v. United States*, 435 U.S. 444, 466–67, 98 S.Ct. 1153, 1167–68, 55 L.Ed.2d 403 (1978). This three-pronged test was applied "in the analogous context" of federal tax immunity by a district court in *United States v. State of Maine*, 524 F.Supp. 1056, 1059 (D.Me.1981). This Court agrees that the Supreme Court's test should govern federal tax immunity cases. The City will be awarded its rental payments if the payments (1) do not discriminate against federal functions; (2) are based on a fair approximation of Amtrak's use of City property; and (3) do not exceed the total cost to the City of the benefits supplied to Amtrak.

The City's rental payments would easily satisfy the first two prongs of the test. First, the rentals are not discriminatory. The City requires rent of any railroad using its public ways. Both private and federal corporations have been asked to pay. Second, the rental fee approximates use. The rent charged is based on the number of square feet occupied by the railroad. *See* Defendant's Memorandum of Law at 41.

■ The "cost" requirement deserves more attention. A tax need not have any relation to governmental costs. "The lawmaker may, in the light of the 'public policy or interest served,' make the [tax] heavy if the lawmaker wants to discourage the activity; or it may make the levy light if a bounty is to be bestowed." *National Cable Television Association*, 415 U.S. at 341, 94 S.Ct. at 1149. A user fee, on the other hand, must be no greater than the government's costs.

■ Amtrak insists that the cost to the government must be measured by actual expenditures. Plaintiff asks this Court to make a distinction between the money spent by the City in providing the railroad with water and sewer services and the cost of the opportunities that the City forgoes when it permits the railroad to use its property. Neither case law nor common sense will support such an artificial distinction.

The federal courts have recognized that the use of a government's land imposes a

real economic cost on that government. They have construed governmental charges as user fees rather than taxes where necessary to allow governments to obtain compensation for the opportunities lost to them when providing the payor with a benefit. For example, in *City of Vanceburg, Ky v. Federal Energy Regulatory Commission,* 571 F.2d 630 (D.C.Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978), the court, holding that local governments are not immune from compensating the federal government for their use of federal dams, explained:

> As a sovereign the Government levies taxes, but as property owner *it may charge fees for the use of its property.* Acting as the Government's agent, pursuant to Section 10(e), the Commission sets and collects fees for the use of Government property. These fees are paid by choice and in exchange for a particular benefit, the use of specific Government property, *just as rents are freely paid for the use of private property.* Taxes, in contrast, are imposed by the sovereign without regard to choice or particular benefit.

571 F.2d at 644 n. 48 (original emphasis removed; different emphasis supplied).

Admittedly, the court's reference to rents in this case was merely dictum. Yet Amtrak has not cited any holdings to the contrary. While courts, faced with situations involving fees for the use of improved property, have attempted to limit their holdings to such cases, *see, e.g., Packet Co. v. Keokuk,* 95 U.S. (5 Otto) 80, 88–89, 24 L.Ed. 377 (1877) (upholding city's right to charge wharfage fees despite Duty of Tonnage Clause, U.S. Const. art. I, § 10, but warning that city cannot "collect wharfage ... for the use of that which is not a wharf, but merely the natural and unimproved shore of a navigable river"), I am not persuaded that such a distinction is tenable. The scope of the federal government's immunity from state taxation is to be narrowly construed. *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 483, 59 S.Ct. 595, 600, 83 L.Ed. 927 (1939). The characterization of rent as a user fee satisfies this rule of construction and this Court's sense of fairness.

While the City does not incur any "out-of-pocket costs" in providing Amtrak with rights of way, Plaintiff's Reply Memorandum of Law at 7, it experiences real costs for which it should be compensated. Giving the railroad the exclusive right to pass through certain streets, waterways, and public lands, obliges the City to give up other economic opportunities. By allowing Amtrak to operate Penn Station, for example, the City gives up the chance to lease that underground area to developers who might be interested in such a prime location. Amtrak's use of the City's land can result in even more indirect costs. The value of the property adjacent to streets under which Amtrak operates is undoubtedly depressed due to the noise and vibrations of passing trains and the destruction of esthetic values. Where the adjacent land is city-owned, the economic loss is direct. Where it is privately owned, the City loses indirectly through the diminution of assessed values and tax revenues. The rental payments compensate the City for these losses and allow it "earn a return," Plaintiff's Reply Memorandum at 23, from its property. Of course, the City receives undeniable benefits from Amtrak's use of its property, *see* Plaintiff's Memorandum of Law at 25, but it can be assumed that the benefits of rail service were considered by the City in 1902 and 1907, and that, as a result, the rights of way have been granted to the railroad for lower rents than would be demanded of other lessees.

As the City points out, the New York Court of Appeals has recognized the value of unimproved municipal property. In *City of New York v. Long Island Railroad Company,* 44 N.Y.2d 827, 337 N.E.2d 982, 406 N.Y.S.2d 450 (1978), the court held that a railroad's obligation to pay rent for its use of the City's streets did not constitute "fees, taxes or assessments" within the meaning of a state statute. The court explained that the duty to pay rent arose out of "contractual obligations," and had not been "imposed by the sovereign." While the Court of Appeals' decision is not binding, I am persuaded by its reasoning.

'On the other hand, I find the cases cited by Amtrak unpersuasive. Many of the cases that it relies on can be distinguished as not involving charges "structured to compensate the government for the benefit conferred," *Massachusetts v. United States*, 435 U.S. 444, 462, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978). *See e.g., Robinson Protective Alarm Company v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir. 1978) (in holding that payments required of alarm company for use of existing underground lines was a tax, court noted that the money was collected in a manner "similar to other gross receipts levies"); *Teleprompter Corp. v. City of New York*, 82 A.D.2d 145, 441 N.Y.S.2d 239 (1981) (payments for right of way based on percentage of gross receipts held to be a "tax" within the meaning of New York statute). Amtrak's position is similarly not supported by *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania Public Utility Commission*, 848 F.2d 436 (3d Cir.1988). That case did not involve a fee compensating the government for economic opportunities lost due to the railroad's use of local property. The charges construed as taxes in that case were for the construction and maintenance of a pedestrian and automobile bridge crossing over the tracks.

*Other Fees*

■ Amtrak urges that even if the rental payments are not taxes, they should be construed as "fees" within the meaning of "any taxes or other fees." Plaintiff's Memorandum of Law at 39. Yet the legislative history of section 546b makes it clear that the phrase "any taxes or other fees" is meant to be read as simply extending to Amtrak the full scope of the federal government's sovereign immunity. *See* House Report at 21 (bill would exempt Amtrak "to the same extent as the United States is exempt from the payment of such taxes or other fees").

This interpretation is bolstered by the principle of *ejusdem generis*, under which the general term "other fees" would be limited by the list of specific types of taxes that preceded it in the House bill. *See* House Report at 21 (bill exempts Amtrak from all state and local taxes, "including but not limited to property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees"). "[W]here specific words precede or follow general words in an enumeration describing a particular subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Services, Inc. v. Marshall*, 593 F.2d 1250, 1259 (D.C.Cir.1978).

*Conclusion*

This Court agrees that the City "is no different than any other landowner entitled to compensation for the use of its property." Defendant's Memorandum of Law at 60. For the reasons set forth above, Amtrak is not exempt from making the payments required under the 1902 and 1907 agreements. Accordingly, the City is entitled to summary judgment. Settle judgment order on two weeks' notice.

SO ORDERED.